**Mohinder SINGH, Petitioner,**

v.

**IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

**No. 01–70177.**

United States Court of Appeals, Ninth Circuit.

Submitted March 12, 2002.*

Filed June 10, 2002.

---

13. 12 U.S.C. § 2617.

14. —— U.S. ——, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002).

15. 533 U.S. 218, 121 S.Ct. 2164, 2173, 150 L.Ed.2d 292 (2001).

16. *Barnhart,* —— U.S. at ——, 122 S.Ct. at 1271.

17. 12 U.S.C. § 2607(a).

* The panel unanimously finds this case suitable for decision without oral argument. Fed. R.App. P. 34(a)(2).

Manpreet Singh Gahra, Law Office of Virender K. Goswami, San Francisco, California, for the petitioner.

Gretchen M. Wolfinger, Department of Justice, Civil Division, Washington, D.C., for the respondent.

Before RYMER, KLEINFELD, and McKEOWN, Circuit Judges.

## OPINION

McKEOWN, Circuit Judge.

Mahinder Singh, also known as Mohinder Singh, a native and citizen of Punjab, India, petitions for review of a decision by the Board of Immigration Appeals. The Board denied Singh's application for asylum and withholding of deportation on the basis of the Immigration Judge's adverse credibility determination. In particular, the Board found that Singh's testimony was not credible because it was inconsistent with information he gave during his airport interview. The airport interview, however, was conducted through an unofficial translator who did not even speak Singh's own language. We conclude that this credibility finding and the Board's other misgivings about Singh's testimony are not supported by substantial evidence. Accordingly we grant the petition and remand for further proceedings.

### BACKGROUND

Singh, who claims to have been a Sikh since birth, owned and operated a tractor repair shop in Noormahal, Punjab, for twenty years before he fled India in 1993. Singh supported his parents, wife, son, and younger brother, Surjit, with the income derived from his shop and a farm that he owned. While hiding from authorities in New Delhi, Singh arranged the sale of his

business to finance his escape from India to the United States. With the help of an "agent," Singh departed India and arrived in New York in March 1993. He left behind his wife and teenage son, who both still live in India.

In the years leading up to Singh's escape, conditions in Noormahal and the Punjab in general were anything but normal. Although Sikhs comprise 60 percent of Punjab's population, "fear of domination by India's Hindu majority and economic concerns have fueled discontent and strife" which led to the formation of several Sikh separatist movements. U.S. DEPARTMENT OF STATE, *India: Comments on Country Conditions and Asylum Claims*, at 4 (February 1994). Singh's brother, Surjit, was a member of one such, ostensibly non-violent movement, the All India Sikh Student Federation ("AISSF") whose goal was the formation of an independent Sikh state of Khalistan.

The governing political party in 1992, the Congress Party, did not support the AISSF or the creation of an independent state. As a consequence of his political activities on behalf of the AISSF, Singh's brother was arrested, held, and beaten by Punjab police on two occasions. After the first arrest, during which he was told to leave the party, Surjit returned to Singh's home and continued conducting AISSF activities. The second arrest occurred in February 1992 during the election of a new Punjab Chief Minister, Beant Singh, who allegedly favored suppressing separatists through violent means including death. Upon release, Surjit stayed for a night at his brother's home before going into hiding.

Singh claims he has not seen his brother since that night in February 1992. Nonetheless, Singh maintained contact with Surjit through letters delivered by Surjit's friends in the AISSF. In March 1992, one such messenger, Harvinder Singh, delivered a message from Surjit to his brother and stayed the night in Singh's home. Harvinder left the next morning with a letter for Surjit from Singh. The Punjab police arrested Harvinder in route, found the letter, and subsequently arrested Singh at his home. Singh was beaten barehanded and with sticks. During the beating, the officers told Singh they were detaining him because the letter revealed that he was an "accomplice" of Surjit and Harvinder, both known members of the AISSF and supporters of Khalistan, and that Singh, too, was a member and in favor of independence. The police also indicated to Singh that they knew Harvinder had eaten dinner and stayed over at Singh's home the night before. Singh was released the following evening in response to pressure from his sarpanch, the village elder. After Singh's release, a local doctor treated his injuries.

According to Singh, several months after his first arrest, the AISSF splintered and the government, specifically Minister Beant Singh and the head of Punjab police, K.P.S. Gill, took advantage of this opportunity to apprehend the remaining members of the AISSF, thereby putting an end to the independence movement. According to Singh, local authorities had been instructed to "crush the movement of Khalistan." As a result, Singh was arrested a second time in September 1992.

The police beat Singh with a rubber pipe, dragged him by his hair, and caused a cut on Singh's head when throwing him into a cell. Singh pointed out the scar at trial. Apparently the police told Singh that "all the ideas of Khalistan, we will drain it out from your mind and will kill all those people who are in favor of Khalistan...." Singh was released the following day after his sarpanch arranged a payment of 45,000 rupees from Singh's family to the

police. Upon release, Singh was again treated by a doctor for his injuries.

Singh testified that the police told him that he was part of the September round-up because his name was placed on a list of AISSF supporters after his first arrest. According to Singh, being added to such a list was a routine part of being arrested; if subsequent trouble occurred, the lists were used to round up individuals associated with the independence movement.

After the second arrest, Singh moved to Delhi where he lived in fear of police who might have recognized him as an AISSF supporter. He hid for four or five months until he could secure passage to the United States. While in Delhi, he secured the aid of an "agent" who facilitated his escape with funds derived from the sale of his business in Punjab. Singh arrived at JFK Airport in New York without a passport or visa in March 1993, at which time he was questioned by an INS officer.

Singh's airport interview was conducted through an unofficial, "outside translator" who spoke Hindi, a language Singh, a native Punjabi speaker only understood "a little." Prior to the interview, Singh claims that the translator solicited a bribe from him in return for giving a statement in Singh's "favor." After Singh told the translator he only had $50, the translator began to verbally abuse him. When asked at trial why he did not report the attempted bribe to the immigration officer, Singh replied, "I do not know English so how could I tell."

The interview consisted of seventeen basic questions as evidenced by the typewritten statement prepared by the immigration officer at the scene and signed by Singh in his native script. The transcript includes the following exchange:

Q: Have you or any members of your family ever been persecuted by the present Gov't [sic] of India?

A: No

Q: Have you ever been arrested by the police in India?

A: Yes, two times because they said I stole food

Q: Did you steal food?

A: No, I didn'tr [sic] they said I did both times occured [sic] last year and I was in jail for a few days

Q: What will happen if you return to India?

A: I will be shot

At Singh's exclusion hearing, the IJ rendered an oral decision discrediting Singh's testimony. The BIA expressly adopted that part of the IJ's decision describing his findings of fact and perceived implausibilities and inconsistencies. Singh now petitions for review of the BIA's decision.

## DISCUSSION

■ The BIA's determination that Singh "was not eligible for asylum must be upheld if 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). We review credibility findings under a substantial evidence standard as well. *Osorio v. INS,* 99 F.3d 928, 931 (9th Cir.1996). In this instance, we are reviewing the Board's independent credibility determination, including those aspects of the IJ's decision expressly adopted by the Board. *Lopez–Reyes v. INS,* 79 F.3d 908, 911 (9th Cir. 1996). Accordingly, the Board "must have a legitimate articulable basis to question the petitioner's credibility, and must offer a specific, cogent reason for any stated disbelief, and any such reasons must be substantial and bear a legitimate nexus to the finding." *Osorio,* 99 F.3d at 931 (citations and quotations omitted). Conjecture and speculation on the part of the Board or the IJ "can never replace substantial

evidence." *Bandari v. INS*, 227 F.3d 1160, 1167 (9th Cir.2000).

Here, the BIA concluded that three aspects of Singh's claim warrant an adverse credibility determination: (1) variances between Singh's airport statement and his claim as asserted at the hearing; (2) "misgivings" about the likelihood of Singh's arrest in March 1992; and (3) lack of a plausible explanation for the arrest many months later in September 1992. We address each in turn.

## I. The Airport Interview

■ In concluding that Singh's testimony was not credible, the Board was particularly concerned with "the variance between [Singh's] initial statement to Service inspectors upon arrival and his claim as asserted at the hearing." It found that Singh had no plausible explanation for such inconsistencies, rejecting any notion that his failure to produce a bribe for the airport interpreter could account for the variance. We disagree. We conclude from this record that the Board's reliance on Singh's airport statements does not constitute a valid ground for an adverse credibility determination. Our decision is not grounded upon any disagreement with the Board's assessment of the effect of the purported bribe, but rather on the language difficulties and other circumstances surrounding the airport interview.

The Board's decision does not detail the perceived inconsistencies in Singh's airport statement; however, the IJ addressed two concerns, the first involving Singh's response to questions about prior arrests. At the airport, Singh apparently admitted to being arrested by the police twice "because they said I stole food." Singh testified at trial that his actual response to the question was that he "gave food to the people of the All India Sikh Student Federation," not that he was accused of having stolen food. In the part of the IJ's deci-

sion explicitly adopted by the BIA, the IJ credited this explanation, but concluded that he was still "at a loss to explain why [Singh] may have told the examining Immigration Officer in New York that at least at one time he may have given food or some assistance to the AISSF without the police knowing about it."

To begin, Singh never claimed that the police did not know about his activities. Rather, his arrests speak for themselves as to the police's knowledge or belief that Singh had assisted members of the AISSF. Nevertheless, the IJ apparently arrived at his conclusion because Singh denied that he was a member of the AISSF. The record as a whole, however, explains and confirms what Singh was attempting to convey at the airport—in short, that he was arrested and tortured for his associations with, and harboring of, known members of the AISSF.

We find no inconsistency between Singh's initial statement at the airport about his arrests and his story at trial: Although not an active member of AISSF, Singh knowingly harbored and aided members of that organization. The record demonstrates that the police had reason to believe that Singh actively assisted known members of the AISSF. To the extent that Singh's statements at the airport were not as detailed as his subsequent testimony at trial, we have held that even with respect to asylum applications, which provide the opportunity for far more detail than an airport interview, "failure to file an application form that was as complete as might be desired cannot, without more, properly serve as the basis for a finding of a lack of credibility." *Aguilera–Cota v. INS*, 914 F.2d 1375, 1382 (9th Cir.1990). Requiring evidentiary detail from an airport interview not only ignores the reality of the interview process, but would, in effect, create an unprecedented preasylum application process.

The IJ also expressed concern with respect to Singh's apparent denial during the airport interview that either he or his family had been persecuted by the Indian government. Because such a response would be inconsistent with Singh's subsequent asylum application and testimony which detailed frequent mistreatment of him and his brother by local authorities, the IJ concluded that these latter claims lacked credibility. We cannot agree that Singh's airport statement, on its own, substantiates an adverse credibility determination where, as here, the record indicates that the statement's accuracy is at issue, not that of Singh's subsequent testimony.

Our principal concern is that Singh did not speak any English upon his arrival in the United States. Although Singh was provided with an "outside translator" during the airport interview, the translator did not speak Singh's language. Rather, the translator spoke Hindi, a language which Singh spoke only "a little." On appeal, the INS argues that the accuracy of Singh's answers to the other questions during the interview demonstrate that translation was not a problem. We note, however, as Singh did at his hearing before the IJ, that the other questions in this perfunctory interview were simple in nature, involving such items as his name, place and date of birth. These questions did not present the translational difficulty that a legal term of art such as "persecution" would. The INS also points to Singh's signature on the interview affidavit as an indication of the statement's accuracy. This is of course a non-starter for an individual who cannot speak English, much less read it.

The circumstance here is not unlike that in the Third Circuit's decision in *Balasubramanrim v. INS,* 143 F.3d 157 (3d Cir. 1998). *See also Senathirajah v. INS,* 157 F.3d 210 (3d 8329 Cir.1998). In *Balasubramanrim,* the applicant first denied ever having been arrested during his airport interview, then claimed to have been arrested once. Before the IJ, Balasubramanrim described at least five other arrests involving physical abuse, including one torturous detention of over a year, to which he had not admitted during his airport interview. The court reversed an adverse credibility determination based on these inconsistencies, concluding that "inconsistencies between the airport statement and Balasubramanrim's testimony ... is not sufficient, standing alone, to support the Board's finding that Balasubramanrim was not credible." 143 F.3d at 164 (citing *Aguilera–Cota,* 914 F.2d at 1382).

While considering the conditions surrounding the petitioner's airport interview and the Board's adverse credibility finding, the *Balasubramanrim* court addressed the Board's failure to accurately assess the petitioner's English proficiency during the airport interview when he was not provided a translator and only spoke a little English. 143 F.3d at 163–64; *see also Senathirajah,* 157 F.3d at 218 (granting petition where "neither the BIA nor the immigration judge appear[ ] to have given any consideration to the difficulty someone from Sri Lanka may have had in understanding 'American English,' particularly under the stressful circumstances of entry into a new country"). Singh's case is even more problematic insofar as he spoke no English; Singh was twice removed from understanding the immigration officer's questions and completely precluded from ensuring that his responses were accurately conveyed to the officer and duly recorded. The English–Hindi–Punjabi–Hindi–English round robin that occurred there begins to take on the patina of the children's game of "telephone."[1] The Board

---

**1.** In this game, the first child whispers something into the ear of a second child who then

in this case did not address the difficulties Singh may have had with multiple linguistic barriers, nor did it adopt the IJ's unsupported conclusion that Singh understood enough Hindi to participate in the interview. As a consequence, we cannot rely on the IJ's bald assertion and overlook the effect these circumstances had on Singh's ability to comprehend all that he was asked, much less verify the accuracy of his responses.

In addition to the linguistic difficulties presented by the airport interview, the *Balasubramanrim* court considered other factors which led it to question the airport statement's reliability, including the fact that the statement itself provided no information as to how the interview was conducted or the document prepared; the fact that the interview did not afford the petitioner the sort of opportunity for explanation encompassed in an asylum application; and finally, the recognition that "an arriving alien who has suffered abuse during interrogation sessions by government officials in his home country may be reluctant to reveal such information during the first meeting with government officials in this country." 143 F.3d at 163.

With respect to the first factor, the court concluded that it could not determine from the examiner's report "how the interview was conducted or how the document was prepared [or] whether the questions and answers were recorded verbatim, summarized, or paraphrased." *Id.* at 162. The typewritten document in this case is no different; contrary to the INS's assertion on appeal, the document provides no indication as to how Singh's statement was taken. Nor can we "tell from the document the extent to which [Singh] had difficulty comprehending the questions, wheth-

er questions had to be repeated, or when and how sign language was used." *Id.* Considering Singh's complete lack of English comprehension and minimal grasp of Hindi, the signed document alone without further evidence of how the interview was conducted does not substantiate the accuracy of Singh's response.

■ *Balasubramanrim* also considered the nature of the airport interview itself in that it was not an application for asylum and therefore did not necessarily contain questions "designed to elicit the details of an asylum claim." *Id.* This observation is pertinent to our case. When the examiner asked Singh what would happen to him if he returned to India, Singh replied, "I will be shot." Rather than pursuing this answer with follow-up questions that might lead to the sort of detailed account later given, the examiner simply moved on to an unrelated question concerning the location of his passport. *See id.* at 163 (describing examiner's disinterest when applicant answered same question by saying the government would kill him). In sum, Singh's 17–question interview hardly provided an opportunity to explain his circumstances, and undue reliance on this perfunctory examination severely undermines the more exhaustive opportunities given to asylum applicants to develop their cases on the merits. *See Senathirajah*, 157 F.3d at 218 ("By placing too much reliance on an airport interview under the circumstances here, and ignoring more detailed accounts in [the asylum application] as well as testimony at an asylum hearing, the INS seriously undermined the reliability of the administrative process.").

Finally, like the court in *Balasubramanrim*, we credit the more normative consid-

---

repeats the process with another child and so on until the last child reports what the first child said, which often bears little resemblance to the original statement. The game

is, of course, conducted in a single language. For a complete description, see http://www. teachervision.com/lesson–plans/lesson–6781.-htm l.

eration that "an arriving alien who has suffered abuse during interrogation sessions by government officials in his home country may be reluctant to reveal such information during the first meeting with government officials in this country." 143 F.3d at 163. Here, Singh—assuming he even understood the question—initially denied having been persecuted, despite admitting to the arrests that constitute the foundation of his asylum claim. The government argues that we should look at Singh's response to the question about persecution in isolation. We cannot do so. Considering the record as a whole, as we must, see Elias–Zacarias, 502 U.S. at 481, 112 S.Ct. 812, the airport statement in this case lacks sufficient indicia of reliability and accuracy on its own 8332 to constitute substantial evidence supporting an adverse credibility determination.

## II. The March 1992 Arrest

 The Board agreed with the IJ that Singh's account of his first arrest in March 1992 was implausible. The record does not support this conclusion. Specifically, the Board was willing to assume that if Singh was arrested, "it was on account of his association with his brother." Nevertheless, it concluded that if this was the reason for his arrest, Singh's failure to testify that he was questioned about his brother's whereabouts is suspect. Of course, any failure to elicit such information would be suspect only if the police's intention was to find Surjit, rather than punish Singh for harboring known AISSF members and maintaining connections with his brother. As the IJ himself noted, *"Arguably,* what the police were looking for at that particular time was someone with knowledge of the whereabouts of the brother...." The problem with this assumption is two-fold: first, it is that, an assumption, not an evidentiary finding; and, second, the record is bereft of any evidence indicating that this was the po-

lice's intention, nor is it evident from the record that Singh ever denied being so questioned. Rather, the record provides a mountain of evidence indicating Singh's connection with active members of the AISSF. As for the IJ's assumptions about what the motives of the police should have been, they are the sort of conjecture and speculation that cannot be used to support an adverse credibility determination. *Bandari v. INS,* 227 F.3d 1160, 1167 (9th Cir.2000); *see also Gui v. INS,* 280 F.3d 1217, 1226 (9th Cir.2002) (reversing adverse credibility determination in part where findings "appear based on the IJ's own opinions as to how best to silence a dissident").

The Board also noted that the general, family-related matters contained in the intercepted letter were "hardly the sort of comments that would give rise to a police interrogation." As the INS argues in its brief, *"Such a letter alone* was unlikely to have prompted a police interrogation." As far as the substance of the letter goes, this may be true; however, the letter should not be examined in a vacuum. Rather, the record as a whole is replete with evidence of Singh's aid to the separatists. Although the letter may not have contained references to AISSF activities, there is no dispute that the letter and Singh's harboring of its courier demonstrated his continued association with active AISSF members. Because the Board's reasons for discounting this testimony do not create a "legitimate articulable basis to question the petitioner's credibility," *Osorio,* 99 F.3d at 931, the Board's skepticism of Singh's account of this arrest is misplaced and not supported by substantial evidence.

## III. The September 1992 Arrest

The Board questioned the veracity of Singh's account of the September 1992 arrest. It concluded that Singh's lack of contact with his brother since the March

1992 arrest and Singh's disavowal of direct participation in AISSF activities leaves him with no plausible explanation for the September 1992 arrest. Once again, the Board's conclusion rests not on the evidence but on conjecture.

The Board has offered no reason other than Singh's apparent inactivity between arrests for why his account should be disbelieved. Premised on the assumption that well-informed local authorities should have been aware of Singh's lack of contact with the AISSF, the Board's conclusion is highly speculative in its own regard. However, even if the local police were somehow aware of Singh's recent inactivity, his exhaustive testimony demonstrates that the conduct of local police at that time was not being driven by their own concerns but those of central authorities far removed. In detail indicating intimate knowledge, Singh described the nature of political events in September 1992—specifically, the splintering of the AISSF between moderates and separatists—which precipitated directives from above ordering a general crackdown on remaining AISSF supporters. He also explained how names of those previously arrested, such as himself, made their way onto lists used for subsequent round-ups of separatist supporters. The Board has pointed to no evidence in the record undercutting this explanation, nor did it offer a cogent reason for rejecting Singh's account. Therefore, considering the detailed account Singh gave of the circumstances leading to this arrest and the Board's failure to provide more than speculation for questioning this account, we conclude that none of the Board's explanations for skepticism are "substantial [or] bear a legitimate nexus to the [adverse credibility] finding." *Osorio,* 99 F.3d at 931.

## IV. The Merits

Having concluded that Singh's testimony is credible, he also asks us to consider the merits of his asylum claim. We decline to do so in part because the Board has not yet had an opportunity to address the remaining issues. And, to the extent that we could review the merits of Singh's case and grant relief, we have held that such review is only appropriate after determining credibility when "it is clear that we would be compelled to reverse [the Board's] decision[on the merits] if it had decided the matter against the applicant." *Navas v. INS,* 217 F.3d 646, 662 (9th Cir.2000). Our review of the record indicates that the probability of relief for Singh is not so clear. We therefore grant the petition and remand for further proceedings on the merits of Singh's application.

**PETITION GRANTED and REMANDED.**