[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 26, 2006
THOMAS K. KAHN
CLERK

No. 05-16003
Non-Argument Calendar

_____

BIA No. A97-669-506

BIRU CHEN,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(May 26, 2006)**

Before MARCUS, WILSON and FAY, Circuit Judges.

PER CURIAM:

Biru Chen, a Chinese National, petitions for review of the Board of Immigration Appeals's (BIA) decision affirming without opinion an Immigration Judge's (IJ) order of removal and denial of his asylum and withholding of removal claims under the Immigration and Naturalization Act (INA) and the United Nations Convention Against Torture (CAT). On appeal, he argues that the IJ's adverse credibility determination was not supported by substantial evidence and his asylum and withholding of removal claims should have been granted. For the reasons set forth more fully below, we deny the petition.

According to a notice to appear issued on January 5, 2004, Chen entered the United States on or about December 29, 2003, and was charged under INA § 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(a)(7)(A)(i)(I), with removability for being an immigrant who was not in possession of a valid visa, reentry permit, border crossing identification card, or other valid document as required by the Attorney General. In March 2004, Chen signed an application for asylum, withholding of removal, and relief under CAT, alleging persecution on account of his political opinion.

In his application, Chen admitted that he spoke both Fuzhou and Mandarin and indicated that he sought asylum because his wife, after giving birth to a second child, was taken away and sterilized, and, several years later, when the government began enforcing the family planning policies more strictly, he was fined 1200 yuan

that he paid in installments. Chen further admitted that, when he was first interviewed, he said he fled to avoid the fine, but that was incorrect and he begged the forgiveness of the U.S. government. If returned to China, he feared that he would be arrested and tortured because the government would know that he opposed the family planning policy and applied for asylum in the United States. Chen's application indicated that he stopped in Hong Kong and two unknown countries en route to the United States.

Also included in the administrative record was the State Department's China Country Report on Human Rights Practices, issued March 31, 2003. Relevant to Chen's claim, the Chinese government implemented a new "Population and Family Planning" law, intending to standardize the implementation of the "birth limitation" policies in the local provinces. The new law required counties to use quotas or other measures to limit the total number of births in each county, as well as requiring married couples to apply for permission to have a second child if they met the stipulated requirements of the local provinces, which sometimes require as many as four years between pregnancies. The law requires couples who have an unapproved child to pay a "social compensation fee." In some poorer, rural areas, couples were permitted to have two children. According to local regulations in at least one province, women who did not qualify for a certificate permitting them to have a child were required to use an intrauterine device (IUD), and were required

3

to undergo quarterly examinations to ensure that it remained properly in place. As for sterilization, central government policy formally prohibits the use of physical coercion to compel persons into abortion or sterilization, although some local officials were reported to have used physical coercion, and under the "state compensation law," citizens may sue officials who exceed their authority in implementing birth planning policy.

The record also included a 2004 State Department Profile of Asylum Claims for China. It indicates that roughly half of Chinese citizens seeking asylum in the United States cite China's family planning policy as their reason. The report notes that enforcement and implementation is difficult to track and varies from locale to locale. Couples who have an unauthorized second child are often required to pay a "social compensation fee." The report also notes that central government policy prohibits the use of physical coercion to compel sterilization, and, while there are reports of coercion in rural areas, most observers believe that the frequency of such cases is declining. Persons returned to China after deportation are rarely fined or abused and generally have been repatriated. Several other documents included in the record generally confirm that China has a family planning policy, that there are occasional reports of forced sterilization, and that fines or "social compensation fees" are often required when a couple has an unauthorized child. Notably, there is a de-classified state department document, which states that there is "no evidence

4

of persecution in Fujian of those with more than one child. The established policy is for the offender to pay a fine for the extra child . . . after which the family continues without any hassles from the government."

Chen also submitted several additional documents, one of which was a letter, purportedly written by his wife, stating that she and Chen were officially registered as married in 1990, and that she and Chen had a son born in 1986 and a daughter born in 1990. Also included were two illegible photocopies of something that may have been an x-ray. Two medical opinions state that the x-rays show blocked fallopian tubes. There is also a photograph of an unidentified stomach. Chen also submitted what appear to be receipts showing payments made toward a "[f]ine for overbirth."

Finally, the record contains a transcript of an interview conducted by an immigration officer conducted on December 29, 2003, the day Chen arrived in the United States. Chen swore to tell the truth and indicated that he understood the questions being asked of him. He then told the immigration officer that his wife arranged his travel to the United States, that he went through Hong Kong and two unknown countries prior to arriving in the United States, and he had not filed for political asylum in any of the countries through which he traveled. Chen then stated that he left China because he violated China's birth control policy, was unable to pay the fine, and had his house torn down by the local government. On

5

January 2, 2004, Chen was interviewed again for a "credible fear" determination, and the notes of that interview indicate that Chen, consistent with his initial interview, said that he had exceeded China's birth limits in 1996, was ordered to pay a fine, and did not have the money to do so. Unable to pay the fine, Chen ran away and went to live in another province, and when the government found out that he had run away, it tore his house down.

At a preliminary hearing, Chen admitted the allegations in the notice to appear and conceded removability. Later, Chen testified that he was married in 1984, but did not register his marriage with the Chinese government until 1990. Chen's first child was born in 1986, and he later had another child in 1990. Chen testified that he left China because his wife was forced to undergo sterilization in 1991 under China's family planning policy. Chen then said that, after the birth of their first child, Chen's wife had an IUD inserted, but at some point the IUD dropped out and was lost, permitting her to have a second child. The government was unaware that Chen's wife was pregnant with a second child because they lived on a small island, but later discovered the child when Chen registered the child in his "household registration book." Despite knowing that registering the second child would cause problems, Chen testified that he would have had more trouble if he did not register the child. Chen further testified that, if he hadn't registered his child and the government found out, he would have been fined and could not

6

afford to pay a fine. Afterward, Chen's wife was told to get sterilized. When asked why he did not relocate within China, Chen testified that he was poor and did not speak Mandarin well.

As for the sterilization itself, Chen testified that officials came to his home and threatened to destroy his house if his wife did not go with them. Chen testified that his wife was gone for three days and, when she returned, told him that she had been sterilized. He said that she had a scar on her lower abdomen, had never again been pregnant, and had a document proving that she had been sterilized. After the sterilization, the family planning office fined him 1200 (presumably yuan), which he paid in installments of 100 to 200 over 2 to 3 years. Chen also presented an x-ray of his wife, apparently as documentation of her sterilization, but the x-ray was not authenticated by the U.S. Consulate. Chen testified that his wife, who apparently remained in China, tried to notarize the certificate of sterilization and the x-ray but was told that it was not necessary to do so.

Next, Chen testified that, although his wife was sterilized in 1991, and he hated the family planning office, he did not apply for a Chinese passport until 2002 because he didn't have any money. After receiving his passport, Chen traveled to Hong Kong with the assistance of a "snakehead" located by his wife. Chen testified that he could not survive in China, and explained that it was because he was a fisherman by trade and there was no longer enough fish to survive. Chen

7

admitted that his motivation for coming to the United States was, in part, for economic reasons. From Hong Kong, Chen traveled to two English-speaking countries, at all times using a passport given to him by the snakehead.

At this point, the IJ told Chen that he simply did not believe that Chen, in a post-September 11, 2001, world, managed to travel through airports without knowing what type of passport he possessed or to what countries he was traveling. Chen then described his passport as being green in color with English writing that he did not understand and a picture of himself inside. Chen testified that he remained in the first country for three weeks and the second country for one week. As for the flight to the United States, Chen testified that he did not have a passport, but was simply given a boarding pass.

On cross-examination, Chen was asked about a discrepancy between his application and his testimony, notably that he had testified that he began paying a fine for his second child right after his wife was sterilized while his application indicated that he had not begun paying the fine until 1996. Chen responded that, at the time of his initial interview with immigration officials, he gave the year 1996 because he was afraid and the officers were becoming angry and staring at him cruelly when he failed to answer a question quickly. He explained that he "did not know America [was] so civilized" and that he was allowed to tell the truth—he thought he should tell a lie like in China. Chen further admitted that he lied when

8

he told the officers that he had fled China because he could not pay the fine and that the government wanted him arrested, causing him to move to another province. Chen also admitted that he lied when he told officials that he had stayed away from his home until 2003, when he left China, and that his house was torn down.

Later, Chen stated that his interview at the airport was conducted in Mandarin, which he did not understand well. However, Chen's second interview was conducted in his preferred language. When asked again why he chose to lie during his interviews, Chen indicated that he was afraid that if he told the truth he would have problems with the government because, in China, telling the truth caused problems with the government. Chen testified that he changed his story after he was released because his lawyer told him to tell the truth and told him that the American government valued being truthful.

Next, the IJ, seeking corroboration for Chen's testimony regarding the sterilization of his wife, asked how the submitted x-rays, purporting to show Chen's wife, could be authenticated as belonging to his wife and not someone else. Chen indicated that there was nothing more that he could do.

The IJ then rendered an oral decision, first finding that he did not know whether or not Chen's wife had been forcibly sterilized. He found that Chen's various statements had been inconsistent as to whether and when he was fined for

9

having the second child. The IJ also found that Chen likely had come to the United States more for economic reasons than for anger at the Chinese government for having forced his wife to be sterilized many years before. The IJ further noted that Chen had lied to asylum officers during his interviews on two different occasions, and even if he had not been provided with a proper interpreter the first time, the second interview was conducted in Chen's preferred language and the lies were the same. "[A]gainst this background of lies," the IJ found no excuse for Chen's untruthfulness.

Next, the IJ found that Chen had not credibly shown that he fled China because of his opposition to China's sterilization policy. Noting that it did not know if the x-ray pertained to Chen's wife, the IJ found that there was no evidence that Chen's wife had undergone a forced sterilization, and further found that Chen was inconsistent regarding when he was fined for having a second child. The IJ further noted that it was just as likely that Chen's wife voluntarily complied with China's regrettable policies, but that Chen's incredible testimony had been insufficient to meet his burden of proof to the contrary.

Thus, the IJ found that Chen had failed to demonstrate past persecution or a well-founded fear of future persecution. In support, the IJ stated that Chen's testimony—that he traveled to two different unknown countries before arriving in the United States—was simply incredible given the heightened security in airports

10

following the events of September 11, 2001. He further found that Chen had not explained why he could not have sought asylum in the other countries if he truly was fleeing from persecution. Furthermore, the IJ found it "difficult to fathom" that Chen would have been allowed to travel to the United States without having his identity checked at some point. Even if Chen had made a showing of entitlement to asylum, however, the IJ stated that Chen's application should be denied as a matter of discretion. As Chen failed to meet the lower burden of proof for asylum, the IJ found that Chen was not entitled to withholding of removal or relief under the CAT.

Chen filed an appeal with the BIA, arguing that his testimony was consistent with his documentation, and that the potential consequence of removal "is the forced sterilization of a woman with two daughters." The BIA subsequently affirmed without opinion the IJ's decision, and, thus, the IJ's decision is the final removal order subject to review. See Mendoza v. United States Attorney Gen., 327 F.3d 1283, 1284 n.1 (11th Cir. 2003) (citing 8 C.F.R. § 3.1(a)(7) (2002)).

On appeal, Chen argues that the IJ's adverse credibility determination was not supported by substantial evidence because it was supported only by minor inconsistencies that did not go to the heart of his claims. He argues that his testimony regarding his wife's sterilization was consistent and persuasive and that he provided corroborating evidence in the form of a documented x-ray report.

11

Chen further argues that any discrepancy between the interview he gave at the airport and his asylum application was adequately explained and reasonable and the IJ's credibility finding was speculative and not based on the record. Finally, Chen argues that, because his testimony was credible, he suffered past persecution and demonstrated a well-founded fear of future persecution based on China's coercive family planning policies.[1]

To the extent that the IJ's decision was based on a legal determination, review is de novo. Mohammed v. Ashcroft, 261 F.3d 1244, 1247-48 (11th Cir. 2001). The IJ's factual determinations are reviewed under the substantial evidence test, and we "must affirm the [IJ's] decision if it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Al Najjar v. Ashcroft, 257 F.3d 1262, 1283-84 (11th Cir. 2001) (citation omitted). Thus, factual determinations "may be reversed by this court only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc), cert. denied by Adefemi v. Gonzales, 125 S.Ct. 2245 (May 16, 2005).

As with other factual findings, "[c]redibility determinations . . . are reviewed

---

[1] Chen offers no argument regarding the CAT, and, therefore, the issue is deemed abandoned. Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005).

under the substantial evidence test." D-Muhumed v. U.S. Attorney General, 388 F.3d 814, 818 (11th Cir. 2004).[2] "The trier of fact must determine credibility, and this court may not substitute its judgment for that of the [IJ] with respect to credibility findings." Id. (citation omitted). Furthermore, "an adverse credibility determination alone may be sufficient to support the denial of an asylum application." Forgue v. U.S. Attorney General, 401 F.3d 1282, 1287 (11th Cir. 2005). On the other hand, "an adverse credibility determination does not alleviate the IJ's duty to consider other evidence produced by an asylum applicant. That is, the IJ must still consider all evidence introduced by the applicant." Id. (emphasis in original). We require that the IJ "offer specific, cogent reasons for an adverse credibility finding." Id. "A credibility determination, like any fact finding, 'may not be overturned unless the record compels it.'" Id.

An alien who arrives in or is present in the United States may apply for asylum. See INA § 208(a)(1), 8 U.S.C. § 1158(a)(1). The Attorney General has discretion to grant asylum if the alien meets the INA's definition of a "refugee." See INA § 208(b)(1), 8 U.S.C. § 1158(b)(1). A "refugee" is:

[A]ny person who is outside any country of such person's nationality

---

[2] It is noted that the REAL ID Act amended, among other things, the judicial review of credibility determinations. See REAL ID Act of 2005, Pub.L. 109-13, 119 Stat. 302 (May 11, 2005). However, those amendments do not apply to applications filed prior to May 11, 2005, the effective date of the amendments. See id. § 101(h); see also Ssali v. Gonzales, 424 F.3d 556, 562 n.4 (7th Cir. 2005).

or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or <u>political opinion</u>. . . .

8 U.S.C. § 1101(a)(42)(A) (emphasis added).  The asylum applicant carries the burden of proving statutory "refugee" status.  <u>See</u> <u>Al Najjar</u>, 257 F.3d at 1284.  To establish asylum eligibility, the alien must, with specific and credible evidence, establish (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor, in this case group membership, will cause such future persecution.  8 C.F.R. § 208.13(a),  (b); <u>Al Najjar</u>, 257 F.3d at 1287.  The INA does not expressly define "persecution" for purposes of qualifying as a "refugee."  <u>See</u> INA § 101(a)(42).  It does, however, provide that:

> For purposes of determinations under this chapter, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

INA § 101(a)(42)(B), 8 U.S.C. § 1101(a)(42)(B).  The BIA has held that an act of

14

persecution in the form of forced sterilization against one's spouse is an act of persecution against the other spouse and establishes past persecution. See Matter of C-Y-Z-, 21 I&N Dec. 915, 919 (BIA 1997).

A showing of past persecution creates a presumption of a "well-founded fear," subject to rebuttal by the INS. 8 C.F.R. § 208.13(b)(1). A "well-founded fear" of persecution may also be established by showing a reasonable possibility of personal persecution that cannot be avoided by relocating within the subject country. 8 C.F.R. § 208.13(b)(2)(i) & (ii). It is "well-established" that the well-founded fear inquiry contains both an objective and subjective component, i.e., the petitioner must be genuinely afraid and that fear must be objectively reasonable. Al Najjar, 257 F.3d at 1289. Furthermore, it is the petitioner's burden to present "specific, detailed facts showing a good reason to fear that he or she will be singled out for persecution." Id. at 1287 (quotation and citation omitted).

The record in this case does not compel a reversal of the IJ's adverse credibility determination. The record reflects that Chen gave two statements to immigration officials immediately after arriving in the United States, and both times, told officials that he left China because he could not afford to pay the fine imposed upon him for having a second child. His asylum application, however, claimed that he lied during the previous interviews and that, in fact, he was seeking political asylum because his wife had been sterilized and he feared that he would

15

be arrested and tortured by the Chinese government because the government would know that he opposed the family planning policy.  In support of his claim regarding his wife, Chen submitted an x-ray, two medical opinions regarding the x-ray, and a picture of a stomach.  The alleged x-ray is an entirely black photocopy that is completely unidentifiable.  There is simply no way to corroborate, based on that document, that the "x-ray" in question pertains to Chen's wife.  Moreover, the record reflects that Chen, during his hearing, testified that he was ordered to pay a fine immediately after his wife gave birth for the second time and was sterilized.  This was contradicted by his asylum application, which indicated that he had not been ordered to pay a fine until "several years later."

The IJ's skepticism regarding Chen's travels after leaving China was also supported.  Chen testified that, after he traveled to Hong Kong, he proceeded to two more countries, one for three weeks, the other for one week, and did not know where he was in either country.  Despite the fact that Chen did not understand the English language, it is rather difficult to imagine that someone would have no idea what country he was in for a three-week period.  Furthermore, as the IJ noted, Chen's story was that he traveled to the United States without having to present any identification whatsoever, and in a post-September 11 world, the IJ's conclusion that the prospects of traveling anywhere by air without some form of identification were slim, especially to the United States, is not an unreasonable

16

conclusion to have made.

Troubling as well is the fact that Chen's wife allegedly suffered the forced sterilization in 1991, but it is Chen who traveled to the United States over 10 years later while his wife remained in China—indeed, Chen testified that his wife arranged for his trip. Moreover, Chen presented no evidence as to why he might be persecuted if returned to China. Although he initially claimed that he could not pay a fine levied on him, he later testified that he had paid the fine in installments, and at least one report indicated that after paying a fine for an extra child, the family continues on without any hassles from the government.

Chen asserts that the IJ erred by relying on the statement Chen initially made while detained at the airport of his arrival, citing three cases from other circuits that have held that airport interviews, standing alone, are insufficient to sustain an adverse credibility determination because of the differing nature of airport interviews and potential language and translation issues. See, e.g., Zubeda v. Ashcroft, 333 F.3d 463, 476-77 (3d Cir. 2003); Singh v. I.N.S., 292 F.3d 1017, 1020-24 (9th Cir. 2002); Balasubramanrim v. I.N.S., 143 F.3d 157, 162-64 (3d Cir. 1998). The decisions cited by Chen stand generally for the proposition that airport interviews should be viewed with caution when making credibility determinations because (1) it is unknown what the circumstances of the interrogation were; (2) linguistic problems result in questions not being understood and translations being

17

misinterpreted; (3) the nature of the interrogation is different than the opportunity afforded to explain an asylum application; and (4) the potential trauma that may prevent an alien from disclosing the information surrounding his asylum claim because of previous abusive interrogations by government officials in his home country. See, e.g., Singh, 292 F.3d at 1023.

First, unlike in the cases cited above, the IJ in this case did not rely solely on inconsistencies in the airport interview, but also on the credible fear interview where Chen gave the exact same answers to the same questions regarding why he fled China to come to the United States. In both interviews, he said that he could not pay a fine levied on him for violating the birth control policy. Furthermore, while there was a question in this case regarding Chen's ability to understand the language used during the airport interview, Chen admitted that his credible fear interview was conducted in the language he speaks best. Moreover, the IJ's reliance on the interviews was not the sole basis for an adverse credibility determination. As discussed above, Chen's description, or perhaps lack thereof, of his travel to the United States was highly implausible. Against the backdrop of two interviews that were inconsistent with the claims made in his asylum application, and coupled with Chen's inconsistent statements at the hearing and his application regarding when he was fined, the IJ's determination that Chen was not credible was reasonable and supported by substantial evidence.

18

Accordingly, because the record does not compel a reversal of the IJ's adverse credibility determination, it also does not compel a reversal of the IJ's determination that Chen failed to meet his burden proof for asylum. The IJ considered Chen's documents, offered as corroboration for his claim, and afforded them little weight because they were not properly authenticated and, at least with respect to the x-ray, it could not even be read. The record clearly shows that the x-ray could not be read, and, moreover, the photograph purporting to be of Chen's wife could also not be identified as pertaining to her because it is solely a close-up of a stomach. In the absence of any corroborating evidence, the IJ's determination that Chen failed to meet his burden of proof is supported by substantial evidence. The record further reflects that Chen had a penchant for lying and he failed to explain several implausibilities in his story. As Chen was unable to meet his burden of proof for asylum, to the extent that he has preserved the issue for review, he is unable to meet the higher burden for withholding of removal. See, e.g., Al Najjar, 257 F.3d at 1292-93.

Basded on the foregoing, we conclude that the record does not compel a reversal of the IJ's adverse credibility determination, and, therefore, Chen's petition is denied.

**PETITION DENIED.**

19