NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0524n.06
Filed: July 27, 2006

No. 05-3748

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

THAMER SALEM TOMA, RAIDA EMANUEL
KARIM, and MARYAN TOMA,

     Petitioners-Appellants,

                                   ON APPEAL FROM THE BOARD OF
v.                                IMMIGRATION APPEALS

ALBERTO GONZALES, Attorney General of the
United States,

     Defendant-Appellee.

_____/

Before:      MARTIN, MOORE, and ROGERS, Circuit Judges.

     BOYCE F. MARTIN, JR., Circuit Judge. Petitioners Thamer Salem Toma, Raida Emanuel

Karim, and Maryan Toma petition this Court to review the order of the Board of Immigration

Appeals affirming the immigration court's decision that denied the petitioners' applications for

asylum. For the following reasons, we GRANT the petition for review, VACATE the immigration

court's decision, and REMAND the case for further proceedings consistent with this opinion.

**I.**

     Thamer Salem Toma and his wife, Raide Emanuel Karim and his daughter Maryan Toma

as derivative beneficiaries, filed a petition for asylum following the initiation of removal

proceedings by the government. The petitioners are native Iraqis who arrived illegally in the United

States on May 17, 2002. Upon their arrival both Toma and Karim were interviewed by officers of

the United States Immigration and Naturalization Service. Both interviews were brief. Toma was first asked background questions regarding his citizenship and the circumstances of his entry into the United States. Toma was then asked only two questions relating to allegations of persecution:

> Q: Do you have any fear or concern about being returned to your home country or being removed from the United States?
>
> A: Yes, because I was accused by the Iraqi government of selling videotapes against the government. I am a Chaldean nationalist, Catholic.
>
> Q: Would you be harmed if you are returned to your home country or country of last residence?
>
> A: Yes. Going to be hanged or killed.

The same questions were posed to Karim, who answered in a manner similar to her husband:

> Q: Do you have any fear or concern about being returned to your home country or being removed from the United States?
>
> A: Yes, because if they hurt my husband they will hurt me.
>
> Q: Would you be harmed if you are returned to your home country or country of last residence?
>
> A: Yes. Going to be hanged or killed.

On May 31, 2002, another officer conducted a second brief interview with Toma as part of a credible fear assessment. During the interview Toma informed the officer that he left Iraq because he was accused of selling and buying videotapes that were anti-government and anti-Baathist Party. Toma also informed the officer that he had been arrested on December 1, 2001, at the video store he owned:

> Q: Tell me what happened [when you were arrested]?

> A: They picked me up from my shop blindfolded me until we got where we were going and they untied my eyes and took me inside - went to a place where some body was sitting at a table in a chair- I was standing in front of him and two people behind me and they would beat me if I answered or not answered their questions- was beaten 2 or three times a weeks - they were beating me and asking me about the cassettes and accuse me of being anti-government - you talk about Muslim and not like them and not like the party and things like this - I only told them I was a Christian - not want to talk to them - me I am a member of a church of St. George -

> Q: How long did they hold you prisoner?

Toma then informed the officer that he was held until January 1, 2002, when one of brothers bribed an officer and Toma was permitted to escape. Toma stated that he then left Iraq because he believed that the Baath party members wanted him executed. The officer questioned Toma as to whether Toma believed that the government was persecuting him because he was Christian or because he refused to join the Baath party and Toma responded: "Both."

On April 17, 2003, Toma filed an application for asylum on behalf of himself, his wife, and their daughter. In the application Toma alleged that he and his family had faced persecution in Iraq as a result of their religion and their anti-Baath party sentiment. Toma indicated that his father had been arrested and tortured as a result of preaching Christianity. In addition, both his uncle and his brother were executed for their allegedly anti-government actions. Toma stated that he, his brothers, and his father had been assaulted on numerous occasions on their way to church. Specifically, Toma recalled other Iraqis throwing stones at his head and dosing him in dirty water to prevent him and his family from entering the church.

In his application Toma recalled being discriminated against because of his religion beginning at a young age. Toma indicated that in elementary school he received lower grades because he was not Muslim. Toma recalled a teacher who ripped off the cross he wore around his

neck and threw it on the ground. The teacher also forced Toma to study the Koran and encouraged other students to beat Toma after school.

Following his graduation from high school, Toma began his mandatory military service in the Iraqi army. While normally Toma would have been required to serve only two years in the army, Toma alleged he was required to served an additional seven years because he was not Muslim. Moreover, he asserted that he was treated poorly during his service because he was Christian. Following his release from the army in February 2000, Toma opened a successful video rental store. Members of the Baath Party continued to cause problems for Toma by extorting money from Toma, and threatening to falsely report Toma to the police for selling X-rated videos. According to his application, Toma sold many Christian videos at his store that were bought by Christians and some Muslims. When Muslim religious leader found out that Toma was selling Christian videos, Toma's application asserts that the religious leaders threatened that if he did not stop selling Christian videos "they would give the religious order for people to come and burn my video store down. According to their Sharia which permits such an act." As a result of this threat, Toma stopped selling Christian videos, which he indicates hurt his business.

Toma's application indicated that on November 30, 2001, following the threats related to his selling of Christian videotapes, members of the Baath Party came to his store and asked him to donate money for a memorial day held to honor Muslims killed during war. Based on his religion Toma refused. Toma stated that the next day he was arrested and accused "of selling anti-government and anti-Baath party cassettes." Toma stated that following his arrest he was tortured. He asserted that he was hung from the ceiling, that his hands were bound, and that he was

beaten in the stomach. The application indicates that he later escaped from prison with his brother's assistance.

Following his escape, Toma's application indicates that religious leaders presented his brother with a signed affidavit indicating that they wanted to kill him for selling Christian videotapes and for allegedly preaching about Christianity. The religious leaders asserted that Toma's actions were a crime according to the Koran and that Toma ought to be punished either by killing or beheading. The affidavit indicates that Toma's "blood was wanted" and that it was the "duty of every jealous Muslim to kill [Toma] and god would repay them." Following the religious leader's affidavit, Toma decided to flee Iraq with his wife and daughter.

On October 2, 2003, the immigration court held a removal hearing to assess Toma's application for asylum. Toma's testimony at the hearing was nearly identical to his claims of persecution in his application. The only substantive difference was that during his testimony Toma stated that the religious leaders had issued two fatwas against him. The first fatwa, prior to Toma's arrest, called upon every Muslim to burn down Toma's store. As a result of that fatwa, Toma stated that he removed the Christian videos from his store. The second fatwa, Toma testified, was issued to his brother after Toma escaped from prison and called on every Muslim to kill Toma.

The immigration court considered Toma's testimony along with the other evidence introduced at the hearing and issued its decision denying Toma's application. The immigration court appears to have concluded that Toma was making a claim for asylum based on both political and religious persecution. As to Toma's claim of political persecution the immigration court concluded that Toma had suffered past persecution as a result of his anti-Baath party views. The court ruled,

however, that given the fundamental changes in Iraq (namely the fall of Sadam Hussein's Baathist regime following the U.S. invasion of Iraq in 2003), Toma had no well-founded fear of future political persecution.

Regarding Toma's claims of religious persecution, the immigration court found Toma's claims to be noncredible. The immigration court found Toma's claims of religious persecution to be noncredible because Toma failed to cite his selling of Christian-related materials as the reason for his arrest when he was initially interviewed by immigration officers in May 2002. According to the immigration court it was not until after the toppling of Saddam Hussein's regime that Toma began to claim his persecution was based on his religious beliefs rather than his anti-government actions. The immigration court interpreted this alleged omission by Toma during his interviews by immigration officers as an indication that his later testimony was fabricated.

Moreover, the immigration court based its conclusion that Toma's claims of religious persecution were noncredible on the fact that Toma did not mention the fatwas issued against him until his testimony at the hearing. Prior to his testimony, the immigration court indicated, there had been no mention of any fatwa against him. The immigration court surmised that Toma "in order to make his claim real or more readily grantable, came up with the story of the fatwa, something out of nothing." On these grounds the immigration court concluded that Toma's claims of past religious persecution were non-credible.

Thus, the immigration court denied Toma's application for asylum on the basis that: (1) Toma could demonstrate past political persecution but no well-founded fear of *future* political persecution and (2) Toma's claims of past religious persecution were noncredible. Toma appealed

the denial of his application for asylum to the Board of Immigration Appeals. The Board summarily affirmed the immigration court's denial of Toma's application without opinion. Toma then filed this timely petition.

## II.

Toma challenges the immigration court's adverse credibility finding on the basis that it is not supported by substantial evidence. Because the Board of Immigration Appeals adopted the immigration court's decision without comment, this Court reviews the immigration court's decision as the final administrative order. *Hasan v. Ashcroft*, 397 F.3d 417, 419 (6th Cir. 2005). Questions of law are reviewed de novo, *Ali v. Ashcroft*, 366 F.3d 407, 409 (6th Cir. 2004), and this Court affirms an immigration court's decision that a petitioner has failed to establish eligibility for asylum if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole," *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). Applying this standard of review, this Court "may not reverse the Board's determination simply because [we] would have decided the matter differently." *Koliada v. INS*, 259 F.3d 482, 486 (6th Cir. 2001). Rather, in order to reverse the factual findings of the Board of Immigration Appeals, this Court must "find that the evidence 'not only supports a contrary conclusion, but indeed compels it." *Id*. (quoting *Klawitter v. INS*, 970 F.2d 149, 152 (6th Cir. 1992)).

Under the INA, the Attorney General may grant asylum to an alien who qualifies as a "refugee," defined as one "who is unable or unwilling to return to [his or her home country] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1158(b)(1),

1101(a)(42)(A). An asylum applicant bears the burden of demonstrating that "persecution is a reasonable possibility should he be returned to his country of origin." *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir.1994) (internal quotation omitted). Despite this burden, an applicant need not demonstrate that he will probably be persecuted if returned because "[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987). "The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 1208.13(a).

An immigration court may determine that an applicant has failed to carry his or her burden of proof by determining that the applicant's testimony is noncredible. This Court has stated that although "an adverse credibility finding is afforded substantial deference, the finding must be supported by specific reasons. An adverse credibility finding must be based on issues that go to the heart of the applicant's claim. They cannot be based on an irrelevant inconsistency." *Sylla*, 388 F.3d at 926 (internal quotation and citations omitted). In addition, "[s]peculation and conjecture cannot form the basis of an adverse credibility finding, which must instead be based on substantial evidence." *Shire v. Ashcroft*, 388 F.3d 1288, 1296 (9th Cir. 2004) (internal quotation omitted). Where the credibility determination is based on inconsistencies found by the immigration court but unsupported in the record, this Court has reversed the immigration court's determination and remanded for further consideration. *Sylla*, 388 F.3d at 930.

Like affirmative inconsistencies, omissions may form the basis of an adverse credibility determination, provided that they are substantially related to the asylum claim. *Liti v. Gonzales*, 411

F.3d 631, 637 (6th Cir. 2005). Nonetheless, "this court exercises extra care in evaluating omissions from asylum applications." *Shkabari v. Gonzales*, 427 F.3d 324, 329 (6th Cir. 2005). Although an omission can sometimes be significant enough to support an adverse credibility determination, "an asylum applicant is not required to provide an exhaustive, detailed list of all incidents of persecution in the asylum application." *Vasha v. Gonzales*, 410 F.3d 863, 871 n. 4 (6th Cir. 2005).

We conclude that the record compels the conclusion that Toma did not omit material information during his two interviews with immigration officers and in his application for asylum that he then raised in his testimony, and that there is not substantial evidence to support the immigration court's adverse credibility findings with regards to Toma's claims of past religious persecution.

A.      *Alleged Inconsistencies between Toma's interviews and his hearing testimony*

As discussed above, Toma did not explicitly inform immigration officers during his first two interviews that his arrest and beatings were in part the result of Toma's selling of *Christian* videotapes at his video store. Instead, Toma stated to the immigration officers that he was arrested and beaten for allegedly selling anti-government and anti-Baath party videotapes. When asked whether he was persecuted because of his politics or because of his religion, however, he replied, "Both."

Moreover, even though Toma did not state explicitly in the first interview that his arrest was based on his religious beliefs, Toma did discuss his religion during the interview. When asked by the officer during the May 17, 2002 interview why he feared returning to Iraq, Toma stated: "because I was accused by the Iraqi government of selling videotapes against the government. I am

a Chaldean nationalist, Catholic." Taken out of context, perhaps the first sentence could be read to indicate that Toma's fears were based solely on his political beliefs. Reading this statement as a whole, however, it appears that Toma was attempting to indicate to the officers that his anti-governmental actions involved not only his political beliefs but also his religious belief as well. In fact, the record indicates that the selling of Christian videotapes is what precipitated the initial arrival of religious leaders at his store, along with law enforcement authorities, to threaten him with a fatwa if he refused to remove the Christian materials. Thus, the immigration court's conclusion that Toma failed to raise a claim of past religious persecution during his first interview is inconsistent with the substantial evidence in the record.

During his second interview two weeks later, Toma also did not explicitly state that the videotapes at issue were Christian videotapes. Nonetheless, he clearly indicated to the interviewing officer that his persecution was at least in part religiously based. When questioned as to what happened to him when he was arrested Toma indicated that he was questioned about his religion and his alleged anti-Muslim actions. See JA at 139 ("they would beat me if I answered or if not answered their questions — was beaten 2 or three times a weeks — you talk about Muslims and not like them and not like the party and things like this — I only told them that I was a Christian — not want to talk to them – me I am member of a church of St. George"). These statements evidence that the individuals who arrested Toma were targeting him at least in part based on his religious affiliation. It even appears in the record that Toma had more to say regarding his religious-based persecution involving the arrest but was cut off by the interviewer questioning.

Additionally, it appears that the immigration court failed to appreciate a subtle but important distinction in Toma's testimony. The immigration court seems to have suggested that Toma originally alleged persecution for not being able to sell anti-government videos. This, however, is a completely different claim from Toma's statements that he was *falsely accused* of selling anti-government videos as a way of persecuting him for *actually selling* Christian videos and refusing to donate to Muslim causes.

Finally, we are hesitant to penalize an applicant for failing to state with sufficient detail during an exceedingly brief initial interview the exact nature of the persecution he faces if he returns to his native land. We are reluctant to sustain an adverse credibility finding on the grounds that an applicant's testimony during a credible fear assessment was not as complete as at the final hearing. Such a requirement, "not only ignores the reality of the interview process, but would, in effect, create an unprecedented preasylum application process." *Singh v. INS*, 292 F.3d 1017, 1021 (9th Cir. 2002); *see also Balasubramanrim v. INS*, 143 F.3d 157 (3d Cir. 1998) (holding that inconsistencies between an applicant's initial statements upon his arrival and his testimony is not sufficient by itself to support an adverse credibility finding). As demonstrated by the sparse interviews the immigration officers conducted with Toma in this case, the interview process does not afford applicants the sort of opportunity for explanation encompassed in an asylum application. The length of the interview is but one cause for concern when relying on an interviewee's omission as grounds for an adverse credibility finding. We also consider that in many cases it is unknown what type of language barrier existed between the interviewer and the interviewee. In addition, we are cognizant that individuals who have been persecuted in their homeland by government officials

might be initially hesitant to speak to government officials upon their arrival in United States. These general concerns regarding relying on initial immigration interviews to assess an applicant's ultimate credibility are particularly illuminating in this case. Contrary to the immigration court's finding, Toma's statements during his initial interviews did indicate that his past persecution was in part religiously based, and require us to conclude that there is not substantial evidence in the record supporting the immigration court's adverse credibility determination.

> B.     *Application*

The other evidence offered by the immigration court to support its adverse credibility finding was certain omissions it alleged were contained in Toma's asylum application. Specifically, the immigration court indicated that Toma failed to mention any fatwas issued against him by religious leaders. Then later during his hearing, Toma testified that religious leaders had issued two fatwas against him — one urging Muslims to burn down his store and the other urging Muslims to kill him. The immigration court concluded that Toma's failure to mention these fatwas in his application was an indication that Toma fabricated their existence in order to bolster his asylum claim. We conclude that there is not substantial evidence in the record to support the immigration court's conclusion.

This Court has never required an applicant to include in the application for asylum every detail of his or her persecution in order to be later found to be credible. As this Court has stated on numerous occasions, "[a]lthough an omission can sometimes be significant enough to support an adverse credibility determination, 'an asylum application is not required to provide an exhaustive, detailed list of all incidents of persecution in the asylum application.'" *Mece v. Gonzales*, 415 F.3d 562, 573 (6th Cir. 2005) (quoting *Vasha*, 410 F.3d at 871 n. 4). The immigration court failed to

acknowledge that Toma's testimony was nearly wholly consistent with his asylum application. Instead, the court chose to focus on the one arguable inconsistency between his testimony and his application — Toma's failure to use the word "fatwa" in his application. The immigration court took this as evidence that Toma made up both the claimed fatwas as well as the religious persecution in general. This reading of Toma's testimony and application is simply not supported by the substantial evidence in the record.

While Toma failed to use the word "fatwa" in his application, he did accurately describe the two alleged fatwas in his application. A fatwa, by definition, is an Islamic religious edict or proclamation. Admittedly Toma did not use the word fatwa in his application; however, the acts by religious leader described in his application fall squarely within the definition of a fatwa. In his application Toma indicated that the religious leaders threatened that if he did not stop selling Christian videos at his video store "they would give the *religious order* for people to come and burn my video store down. According to their Sharia which permits such an act."

Following his arrest, Toma's application asserted that as a result of Toma's actions the religious leaders threatened that Toma's actions were a crime according to the Koran and that Toma ought to be punished either by killing or beheading. While Toma's application did not use the word fatwa to describe these pronouncements by religious leader, as Toma later described them in his testimony, it is abundantly clear that these pronouncements fall squarely within the definition of a fatwa. Thus, Toma's application and his testimony were consistent regarding the actions of the religious leaders — the only distinguishing feature was his word choice. The evidence in the record simply does not support the immigration court's conclusion that Toma, "in order to make his claim

real or more readily grantable, came up with the story of the fatwa, something out of nothing."

Based on this fact, along with the fact that there is not substantial evidence to support the omissions

the immigration court found to exist in Toma's initial interviews, we conclude that there is not

substantial evidence to support the immigration court's adverse credibility finding relating to

Toma's claims of past religious persecution.

## III.

We therefore GRANT the petition for review, VACATE the immigration court's adverse

credibility finding, and REMAND the case to the BIA for reassignment to a new immigration judge

and proceedings consistent with this opinion.

ROGERS, Circuit Judge, dissenting.

I respectfully dissent because, in light of the deference afforded to findings of the Board of Immigration Appeals, I would hold that substantial evidence supports the immigration court's adverse credibility determination.

Toma's omissions during his two initial interviews cast doubt upon his later claim of religious persecution. In those interviews, Toma claimed that he had been persecuted by the Iraqi government for selling anti-government and anti-Ba'ath party videotapes, but he mentioned his religion on only three brief occasions. In neither the first interview nor the second, lengthier interview two weeks later (consisting of 41 questions) did Toma discuss selling Christian videotapes, the two alleged Fatwas calling for his death, or any meaningful religious persecution. In fact, in response to the interviewer's question concerning how Toma knew he was to be executed if he returned to Iraq—an opportune time to mention the Fatwas—Toma stated only that it was because "the way they treated me—there was no papers—nobody would know and my brother had a hard time" and because the "Government is a dictatorship." It is incredible that one who had two death edicts issued against him and who had such problems stemming from his sales of Christian videotapes would state only that he feared death for selling anti-government videotapes. For this reason, and because the panel is reviewing under a "highly deferential standard," *Yu v. Ashcroft*, 364 F.3d 700, 703 (6th Cir. 2004), I would hold that substantial evidence supports the immigration court's adverse credibility determination.

Although cases from the Third and Ninth circuits have treated initial airport interviews as insufficient standing alone to support adverse credibility determinations, *see Singh v. INS*, 292 F.3d

1017, 1021-24 (9th Cir. 2002); *Balasubramanrim v. INS*, 143 F.3d 157, 162-64 (3d Cir. 1998), those cases are distinguishable for several reasons. First, in both cases the courts questioned the accuracy of the interviews because the applicants were not given reliable translators. *See Balasubramanrim*, 143 F.3d at 163 (no translator and no evidence that petitioner spoke proficient English); *Singh*, 292 F.3d at 1022 (translator did not even speak petitioner's language). Here, however, Toma was given a translator, and he does not argue that the translations were faulty. Second, both *Balasubramanrim* and *Singh* expressed concern over the reliability of initial airport interviews because of the brevity of the interviews and applicants' nervousness and fear of authorities. *See Balasubramanrim*, 143 F.3d at 162-63; *Singh*, 292 F.3d at 1023-24. In this case, Toma was not only interviewed at the airport, he was also interviewed at greater length two weeks later. This gave Toma a chance to become more comfortable speaking with U.S. officials and to expand upon his first set of answers.

There was a sufficient basis for the immigration judge to have determined that Toma shifted his asylum claim to one of religious persecution after the fall of the regime of Saddam Hussein. As a result, I cannot say that the evidence "compels" a conclusion contrary to the immigration court. *Klawitter v. INS*, 970 F.2d 149, 152 (6th Cir. 1992). I would therefore deny the petition for review.