**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARC ANTOINE JOSEPH,
               *Petitioner,*

v.

ERIC H. HOLDER JR., Attorney
General,
              *Respondent.*

No. 05-74390

Agency No.
A098-005-438

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
February 1, 2010—Pasadena, California

Filed April 14, 2010

Before: Betty B. Fletcher, Harry Pregerson, and
Susan P. Graber, Circuit Judges.

Opinion by Judge Pregerson;
Concurrence by Judge Graber

## COUNSEL

Josh Chatten-Brown and Carmen Chavez, Casa Cornelia Law Center, San Diego, California, for the petitioner.

Melody K. Eaton and Molly L. DeBusschere, U.S. Department of Justice Office of Immigration Litigation, Washington, D.C., for the respondent.

## OPINION

PREGERSON, Circuit Judge:

Marc Antoine Joseph petitions for review of the Board of Immigration Appeals' ("BIA") decision affirming an immigration judge's ("IJ") denial of his applications for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). We have jurisdiction under 8 U.S.C. § 1252. The IJ found that Joseph was not credible. The main issue here is whether an IJ, who presides over the same petitioner's bond hearing and removal hearing, may use her notes from the unrecorded bond hearing in reaching her decision in the removal hearing. We conclude that she may not. Because the other bases of the IJ's and BIA's adverse credibility finding were also erroneous, we grant the petition for review and remand to the BIA for it to determine whether, accepting Joseph's testimony as true, he is eligible for relief.

## I.  FACTS AND PROCEDURAL HISTORY

### A.  Joseph's Testimony at his Removal Hearing

We summarize the testimony Joseph gave at his removal hearing on January 25, 2005. Joseph, a 29-year-old Haitian musician, started his own band in his hometown of Petite Riviere de l'Artibonite ("Artibonite"). In 2000, President Aristide visited Artibonite. After hearing Joseph sing, Aristide asked Joseph to create a musical group to support the Aristide movement in the Artibonite region. Joseph wrote music for the group,[1] played the cornet, and was the spokesman and contact person for the group.

After this initial encounter with Aristide, Joseph became involved with Aristide's political party, "Lavalas." Joseph organized meetings and protests for Lavalas in the Artibonite region and attended around 20 to 25 Lavalas meetings himself. Joseph testified that he supported Aristide "simply" because he thought that "Aristide would have changed the economy of the country, and he had changed the poverty of the people" and because he believed that "Aristide was the one to change that. . . . He tried to change the economy of Haiti to put Haiti at a higher standard."

On April 22, 2004, Joseph held a Lavalas meeting at his house. Joseph testified that a man named "Dario," who was a member and director of "Ramikos," a group opposing Lavalas, came to Joseph's house to disrupt the meeting. Dario pressured Joseph to join Ramikos and threatened to kill Joseph if he refused to join. When Joseph asked Dario to

---

[1]The lyrics from the songs that Joseph composed for Aristide were admitted into evidence in immigration court. In court, Joseph sang one of the songs, which roughly translated as: "The rich, the people above, we are the bottom, you know, we are misery, we are misery. The people up there, they're rich, they're pushing us down, we're still in misery, we're still in misery."

leave, Dario threw stones at Joseph, hitting him on the head. Dario then punched Joseph in the face. Joseph believes that if the other people present at the Lavalas meeting had not separated them, Dario would have killed Joseph because Dario was "known as a very dangerous man." Later that night, between midnight and one in the morning, Dario returned, broke down the front gate of Joseph's house, and started shooting. Joseph believed that Dario had returned to kill him. Joseph's mother told Joseph to leave the house and "go very far away."

Joseph fled from Artibonite to Lincour, where his friend Vladimir lived. Vladimir later returned to Joseph's house and found that Ramikos members had severely beaten Joseph's mother and raped Joseph's sister. On June 1, 2004, Vladimir and his friends were playing dominoes in front of the house when they saw Dario and around 20 other Ramikos members approaching. Joseph, believing that Dario had come to kill him, fled from Lincour to Port-au-Prince. When Joseph arrived in Port-au-Prince he stayed with Vladimir's friend, Herold, for 23 days before leaving Haiti.[2]

After Joseph left Haiti, on July 29, 2004, Joseph's cousin, Dumarsais Riker, visited Joseph's mother in Artibonite. Joseph and his cousin were similar in appearance and wore the same clothes. Joseph believes that Ramikos shot and killed Dumarsais, burned Dumarsais's car, and destroyed Joseph's mother's house because they mistook Dumarsais for Joseph. Joseph submitted into evidence photographs of Dumarsais's body, his car, and the destroyed house.

---

[2]Joseph had applied for and secured a Mexican visa in December 2003, which expired on May 11, 2004, because he wanted to go to Mexico to study computer engineering. Joseph had previously studied computers in Haiti for 5 months. Joseph decided not to leave Haiti as planned in January 2004 because he was "very busy in preparation of independence day in Haiti," organizing events on behalf of Lavalas. After the incidents with Ramikos in April and June 2004, Joseph secured a second Mexican visa and traveled through Mexico to the United States.

According to Joseph, his mother and sister moved to avoid further harassment by Ramikos. Joseph's girlfriend ended their relationship because of harassment from Dario and Ramikos.

Joseph left Haiti because "members of the group of Ramikos and Dario were looking for [him] to kill" him. Joseph explained that Ramikos had become even more powerful and is now associated with a group named "184." Joseph testified that Ramikos and 184 can do whatever they want in Haiti and would kill Joseph if he returned. Joseph believes that the groups opposed to Lavalas, including 184, would "know [his] name and would eventually kill [him]" anywhere in Haiti.

Joseph entered the U.S. from Mexico, without documents, on or around July 2, 2004. On July 4, 2004, U.S. Border Patrol Officers apprehended Joseph and issued a Notice to Appear charging Joseph with entering the U.S. without inspection. On August 5, 2004, Joseph appeared without counsel at his master calendar hearing before an IJ. Joseph was also unrepresented at his August 27, 2004, bond hearing in front of the same IJ who denied his application for bond. No transcript of the bond hearing exists.

## B.   The IJ Considered Her Bond Hearing Notes During Joseph's Removal Hearing

According to the IJ's bond hearing notes and contrary to the testimony Joseph gave during his removal hearing, Joseph "testified that he left Haiti because a group of President Aristide's wants to kill him." The bond hearing notes indicate that Joseph also testified that he was a member of a band that played every Easter. According to the IJ's bond hearing notes, Joseph testified that Dario was a member of a pro-Aristide group, rather than an anti-Aristide group as Joseph later testified during his removal hearing. Further, the IJ's bond hearing notes reflect that Dario argued with Joseph and threw rocks

at him because Dario wanted to break up Joseph's band, not because, as Joseph later testified at his removal hearing, Dario wanted Joseph to join Ramikos, the anti-Aristide group.

On January 25, 2005, the same IJ presided over Joseph's removal hearing. At this hearing the IJ sought to supplement the record with her notes from Joseph's bond hearing. Joseph's counsel challenged the propriety of including the bond hearing notes in the record of Joseph's removal hearing because there was no transcript of the bond hearing. Nonetheless, the IJ's bond hearing notes were typed into a bond memorandum and included in the record of Joseph's removal hearing.

## C. The IJ and BIA decisions

On January 25, 2005, the IJ denied Joseph's claim for asylum, withholding of removal, and relief under CAT because she had "very real concerns regarding the credibility of [Joseph's] claim." The IJ found that Joseph submitted a detailed declaration and detailed testimony at his removal hearing. Because of that detail, the IJ stated that she "would have expected . . . a more thorough explanation, during the bond hearing, with respect to [Joseph's] fear, his past persecution." Specifically, the IJ "would have expected to have been told of persecution and assaults on [Joseph's] family" when she asked Joseph at his bond hearing why he had left Haiti.

The BIA affirmed the IJ's decision and specifically stated that it found that the record supported the IJ's adverse credibility finding. The BIA found "no error on the part of the [IJ] in noting the inconsistencies between the claim presented by [Joseph] during his bond hearing and that presented subsequently during his merits hearing." The BIA also denied Joseph's motion to remand, which Joseph had filed alongside his appeal.

## II.  STANDARD AND SCOPE OF REVIEW

Where the BIA cites *Matter of Burbano*, 20 I. & N. Dec. 872 (B.I.A. 1994), and does not express disagreement with any part of the IJ's decision, the BIA adopts the IJ's decision in its entirety. *See, e.g., Abebe v. Gonzales*, 432 F.3d 1037, 1040 (9th Cir. 2005) (en banc). Where, however, the BIA conducts its own review of the evidence and law, the court's "review is limited to the BIA's decision, except to the extent the IJ's opinion is expressly adopted." *Hosseini v. Gonzales*, 471 F.3d 953, 957 (9th Cir. 2006) (internal quotation marks omitted).

Here, the BIA cited *Matter of Burbano* and emphasized that it found the IJ's adverse credibility finding "supported by the record." After the BIA explained why it agreed with the IJ's adverse credibility finding, it addressed Joseph's arguments that the IJ had improperly based her adverse credibility finding on Joseph's testimony at the bond hearing. Because the BIA expressly adopted the IJ's decision under *Matter of Burbano,* but also provided its own review of the evidence and the law, we review both the IJ and the BIA's decision. *Hosseini*, 471 F.3d at 957.

Credibility determinations are reviewed under the substantial evidence standard. *Soto-Olarte v. Holder*, 555 F.3d 1089, 1091 (9th Cir. 2009).[3] Under the substantial evidence standard, credibility findings are upheld unless the evidence compels a contrary result. *Don v. Gonzales*, 476 F.3d 738, 741 (9th Cir. 2007).

---

[3]We apply pre-REAL ID Act standards because Joseph filed his application for relief on December 3, 2004, which was before May 11, 2005, the effective date of the REAL ID Act. *See Sinha v. Holder*, 564 F.3d 1015, 1021 n.3 (9th Cir. 2009) (applying pre-REAL ID Act standards because the petitioner's asylum application was filed before May 11, 2005).

## III.  DISCUSSION

### A.  The IJ Erred by Considering Her Bond Hearing Notes During the Removal Hearing

[1] We must decide whether the IJ erred in considering her unrecorded notes from Joseph's bond hearing during his later removal hearing. The BIA found that the IJ had not erred in "noting the inconsistencies between the claim presented by [Joseph] during his bond hearing, and that presented subsequently during his merits hearing." Joseph argues that the IJ's consideration of her notes from Joseph's unrecorded bond hearing was an error. In support of his claim, Joseph cites 8 C.F.R. § 1003.19(d). This regulation, which pertains to bond hearings, states that "[c]onsideration by the [IJ] of an application or request of a respondent regarding custody or bond under this section shall be separate and apart from, and *shall form no part of*, any deportation or removal hearing or proceedings." 8 C.F.R. § 1003.19 (emphasis added).[4]

---

[4]Title 8 C.F.R. § 1003.19(d) refers to the contents of the bond hearing as a whole, rather than just an "application or request" for bond, because no such application or formal request is required. Section 1003.19(b) states that an application for bond "may be made orally, in writing, or, at the discretion of the [IJ] by telephone." The Immigration Court Practice Manual, first published in February 2008 at the direction of the Attorney General, states that a "request for bond hearing may be made in writing. In addition . . . a request for bond hearing may be made orally in court or, at the discretion of the Immigration Judge, by telephone." The Office of the Chief Immigration Judge, Immigration Court Practice Manual, § 9.3(c), *available at* http://www.justice.gov/eoir/vll/OJICPracManual/Chap9.pdf (last visited Apr. 2, 2010). Section 9.3(e)(v) states that the documents for an IJ to consider are "filed in open court or, if the request for a bond hearing was made in writing, together with the request." The detained immigrant "should make an oral statement . . . addressing whether the alien's release would pose a danger to property or persons, whether the alien is likely to appear for future immigration proceedings, and whether the alien poses a danger to national security." *Id.* Thus, because there is no written "application" or "request" regarding bond, 8 C.F.R. § 1003.19(d) refers to the entire bond hearing, and not only the written application or request for bond.

**[2]** In response, the government cites 8 C.F.R. § 1240.7(a), pertaining to removal hearings, which states that the IJ "may receive in evidence any oral or written statement that is material and relevant to any issue in the case previously made by the respondent or any other person during any investigation, examination, hearing, or trial." The government argues that this regulation renders the IJ's bond hearing notes admissible. We hold that 8 C.F.R. § 1240.7(a) does not apply in this case.

## 1.   8 C.F.R. § 1240.7(a) Does Not Apply Here

**[3]** At first blush, 8 C.F.R. § 1003.19(d) and 8 C.F.R. § 1240.7(a) seem to be in conflict. We need not, however, resolve that conflict here or attempt to harmonize the regulations because § 1240.7(a) does not apply to Joseph's case. Section 1240.7(a) allows the receipt in evidence of an "oral or written statement" made by the asylum seeker, or another person, during "any investigation, examination, hearing, or trial." Here, the evidence was not of such a "statement"; rather, the evidence in question was the IJ's own notes, not part of the record, taken by the IJ during Joseph's unrecorded, uncounseled bond hearing. No transcript exists for Joseph's bond hearing.[5] No effort was made to introduce specific evi-

---

[5]This is in keeping with the general practice for bond hearings. Section 9.3(e) of the Immigration Court Practice Manual states: "Bond hearings are less formal than immigration court proceedings." § 9.3(e); *see also Matter of Chirinos*, 16 I. & N. Dec. 276 (B.I.A. 1977). The BIA Practice Manual states that "[b]ond hearings are seldom recorded and are not routinely transcribed." BIA Practice Manual at § 7.3(b)(ii), available at http://www.justice.gov/eoir/vll/qapracmanual/pracmanual/chap7.pdf (last visited Apr. 2, 2010); *see also* Immigration Court Practice Manual § 9.3(e)(iii) ("Bond hearings are generally not recorded."); § 9.3(vi) ("At the [IJ's] discretion, witnesses may be placed under oath and testimony taken. However, parties should be mindful that bond hearings are generally briefer and less formal than hearings in removal proceedings."). Although only one published federal decision has cited the Immigration Court Practice Manual, we find it to be a useful resource to determine the procedure before the IJ. *See Vongsa Sengkeo v. Horgan*, 2009 U.S. Dist. LEXIS 109899, at *9 n.5 (D. Mass. Nov. 24, 2009) (citing Practice Manual).

dence of the precise content of Joseph's oral statements made at his unrecorded bond hearing. Because 8 C.F.R. § 1240.7(a) does not apply, we need not reconcile this regulation with 8 C.F.R. § 1003.19(d) or determine which regulation, if any, would govern in the event of a conflict. Moreover, as we discuss below, § 1003.19(d) does not, as a rule, permit an IJ sitting in removal proceedings to rely on her notes from a bond hearing.

### 2. Bond and Removal Hearings are Distinct and Evidence from a Bond Hearing Should Not be Considered in a Removal Hearing

The case law, although sparse, supports Joseph's argument that § 1003.19(d) precludes the IJ from considering evidence from a bond hearing, in this case the IJ's notes, in determining a petitioner's credibility at a removal hearing. The BIA has noted that "bond and removal are distinctly separate proceedings." *In re R-S-H-,* 23 I. & N. Dec. 629, 630 n.7 (B.I.A. 2003) (citing 8 C.F.R. § 1003.19(d)); *see also Bobb v. Attorney Gen. of U.S.*, 458 F.3d 213, 216 (3d Cir. 2006) (noting an IJ's decision, affirmed by the BIA, that a determination at the bond hearing that an alien's conviction was not an aggravated felony was not controlling in the removal hearing); *Pina v. Horgan*, No. 07-11036, 2007 U.S. Dist. LEXIS 86912, at *3-4 (D. Mass. Nov. 27, 2007) (noting that bond and removal hearings are separate).

**[4]** Although the Ninth Circuit has not interpreted 8 C.F.R. § 1003.19(d), the Seventh Circuit discussed 8 C.F.R. § 1003.19(d) in *Flores-Leon v. INS*, 272 F.3d 433 (7th Cir. 2001). In that case, the petitioner, Flores-Leon, asserted a denial of his due process rights because the IJ presided over both the bond hearing and the removal hearing. *Id.* at 440. The Seventh Circuit found that nothing in the regulations precluded the IJ from conducting both proceedings. *Id.* Further, the court concluded that the IJ did not err because the IJ did not use any information provided at the bond hearing to ren-

der his decision in Flores-Leon's removal hearing. *Id.* In so holding, the *Flores-Leon* court suggests that it would have been improper for the IJ to consider any of the information provided at the bond hearing to render a decision at the removal hearing. This is exactly what happened in Joseph's case. In this case, although the IJ properly presided over both proceedings, unlike the IJ in *Flores-Leon*, the IJ *did* use the information she gathered at Joseph's bond hearing to find Joseph not credible in his removal hearing.

**[5]** The BIA has not specifically interpreted this aspect of 8 C.F.R. § 1003.19(d) in a published opinion. The case most closely on point is *In re Adeniji*, in which the BIA held that evidence presented in an alien's removal hearing, which was conducted before the bond hearing, could not be considered during the separate bond hearing unless it was made part of the bond record. 22 I. & N. Dec. 1102, 1115 (B.I.A. 1999) (en banc). Although *In re Adeniji* indicates that evidence from a removal hearing, if made part of the record, can be considered in a bond hearing, it gives us strong reason to believe that the converse is not true. That is, *In re Adeniji* suggests that evidence from a bond hearing should not be considered during a removal hearing. In particular, in her concurrence and dissent, BIA Member Lory Rosenberg explains that the "underlying purpose of the regulation [§ 1003.19(d)] is not to limit the information an [IJ] may consider in redetermining bond, but to [ensure] that evidence presented in the far more informal bond hearing does not taint the ultimate adjudication of the charges of removability." *Id.* at 1126. Thus, the BIA's decision that evidence from a removal hearing may be considered in redetermining bond is "notwithstanding the rule that evidence presented at a bond hearing cannot be used to establish removability." *Id.* We find this explanation highly persuasive in support of our conclusion that § 1003.19(d) precluded the IJ in Joseph's case from relying on her notes from the bond hearing.

The Immigration Court Practice Manual also suggests that Joseph's interpretation of the regulation is correct. Section

9.3(a) cites 8 C.F.R. § 1003.19(d) and states that "[b]ond proceedings are separate from removal proceedings." Further, § 9.3(e)(iv) of the Immigration Court Practice Manual states that, in a bond hearing, the IJ "creates a record, which is kept separate from the Records of Proceedings for other Immigration Court proceedings involving the alien." There would be little utility in keeping separate records of the proceedings if the IJ could freely commingle these records.

The Immigration Court Practice Manual also shows that the purpose of a bond hearing departs significantly from the purpose of an asylum hearing. According to the Practice Manual, the purpose of a bond hearing is for the detained immigrant to "make an oral statement . . . addressing whether the alien's release would pose a danger to property or persons, whether the alien is likely to appear for future immigration proceedings, and whether the alien poses a danger to national security." Practice Manual § 9.3(e)(vi). Thus, the purpose of a bond hearing, to determine whether an alien in custody should be released, markedly differs from the purpose of a removal hearing, which is to determine whether the petitioner is removable and whether he or she is eligible for relief from removal.

**[6]** Therefore, the IJ in Joseph's case strayed from the purpose of a bond hearing when she apparently asked him why he left Haiti. Further, the IJ had no reason to "expect" to be told of "persecution and assaults" on Joseph's family during his bond hearing. The IJ impermissibly considered her notes from Joseph's bond hearing to evaluate Joseph's credibility during his removal hearing. Thus, the inconsistencies between Joseph's bond hearing testimony according to the IJ's notes and his testimony during his removal hearing do not constitute substantial evidence to support the IJ's adverse credibility finding.

### 3. Statements from Less Formal Proceedings Do Not Undermine an Applicant's Credibility During the Applicant's Removal Hearing

**[7]** Our precedent gives us reason to preclude the IJ from relying in removal proceedings on notes from a bond hearing. We have rejected adverse credibility findings that relied on differences between statements a petitioner made during removal proceedings and those made during less formal, routinely unrecorded proceedings. Two examples of these less formal proceedings are airport interviews and affirmative asylum interviews.

In *Singh v. INS*, we recognized that "[r]equiring evidentiary detail from an airport interview not only ignores the reality of the interview process, but would, in effect, create an unprecedented preasylum process." 292 F.3d 1017, 1021 (9th Cir. 2002). We therefore held that the agency's adverse credibility finding could not rest solely on the lack of detail in the applicant's initial statements at the airport as compared to his later hearing testimony. *Id.* at 1021-24. Similarly, in *Arulampalam v. Ashcroft*, we found that a petitioner's omission during an airport interview of specific details of torture revealed later during the petitioner's removal hearing did not support the agency's negative credibility finding. 353 F.3d 679, 688 (9th Cir. 2003).

In another case, *Singh v. Gonzales*, we found that "[c]ertain features of an asylum interview make it a potentially unreliable point of comparison to a petitioner's testimony for purposes of a credibility determination." 403 F.3d 1081, 1087 (9th Cir. 2005). Specifically, the *Singh v. Gonzales* court noted that there is no requirement that an asylum officer take evidence under oath. *Id.* at 1087-88 (citing 8 C.F.R. § 208.9(c)). The court held that a contradiction between the petitioner's asylum interview and the removal hearing was not substantial evidence justifying an adverse credibility finding. *See id.* at 1087.

**[8]** Bond hearings, like airport interviews and affirmative asylum interviews, are far less formal than removal hearings.[6] It is also worth noting the low levels of legal representation for detained immigrants, those who undergo a bond hearing.[7] In this case, the IJ herself explained that "respondents who are unrepresented by counsel oftentimes do not give a complete explanation of events causing them to leave their home country." Because the bond hearing lacks procedural safeguards to ensure reliability, including the requirement of an oath and a transcript of the proceedings, testimony given in bond hearings, as stated under 8 C.F.R. § 1003.19(d), shall be "separate and apart from, and shall form no part of, any deportation or removal hearing or proceedings."

### 4. The IJ Erred in Finding Joseph Not Credible Based on His Omission of Detail at His Bond Hearing

**[9]** As discussed above, the IJ erred in considering her notes from Joseph's bond hearing in reaching a decision in his removal hearing. Because of this error, any omission of detail regarding Joseph's fear of persecution at his bond hearing cannot undermine his credibility for the purposes of the claims Joseph asserted during his removal hearing.

---

[6]*See* discussion *supra* note 5.

[7]The American Bar Association's Commission on Immigration has documented the low levels of representation for detained immigrants. In a 2004 report, the ABA reports that "only ten percent of people detained by ICE secure legal representation in their cases." ABA Commission on Immigration, Immigration Detainee Guide, 1 (ABA 2004), *available at* http://www.abanet.org/publicserv/immigration/probonoguidefinal.pdf (last visited Apr. 2, 2010). In a 2010 report, the ABA reports that 84% of detained immigrants do not have representation. ABA Commission on Immigration, Executive Summary on Reforming the Immigration System: Proposals to Promote Independence, Fairness, Efficiency, and Professionalism in the Adjudication of Removal Proceedings, ES-7, ES-39 (ABA 2010), *available at* http://new.abanet.org/Immigration/Documents/ReformingtheImmigrationSystemExecutiveSummary.pdf (last visited Apr. 2, 2010).

In this case, the IJ found Joseph not credible in part because she claimed he did not discuss the harm suffered by his mother and sister in Haiti during his bond hearing. The IJ also stated that, "in light of [Joseph's] detailed declaration and testimony," the court would have expected "a more thorough explanation, during the bond hearing, with respect to [Joseph's] fear, his past persecution." The government, citing *Alvarez-Santos v. INS*, 332 F.3d 1245, 1254 (9th Cir. 2003), and *Li v. Ashcroft*, 378 F.3d 959, 963 (9th Cir. 2004), argues that the omission of detail can be fatal to credibility. In both *Alvarez-Santos* and *Li*, however, the omission of detail was from the petitioner's testimony given during the removal hearing itself or in the asylum application, not from a bond hearing. Even if the IJ could properly consider the lack of detail Joseph gave at his bond hearing, "a general response to questioning, followed by a more specific, consistent response to further questioning is not a cogent reason for supporting a negative credibility finding." *Kaur v. Ashcroft*, 379 F.3d 876, 887 (9th Cir. 2004); *Akinmade v. INS*, 196 F.3d 951, 957 (9th Cir. 1999) (finding testimony sufficiently detailed, especially where the petitioner was not on notice to provide such additional information).

As discussed above, however, the IJ should never have considered her notes from Joseph's unrecorded bond hearing. If the IJ had not improperly considered those notes during Joseph's removal hearing, there would have been no issue as to omission of detail.

## B.  Substantial Evidence Does Not Support the IJ's Adverse Credibility Finding

The next issue is whether the IJ's other findings support her adverse credibility finding. The BIA and IJ erred in basing their adverse credibility finding on several findings: 1) Joseph's failure to provide Dario's last name; 2) Joseph's lack of understanding of the complex political situation in Haiti; 3)

Joseph's failure to depart Haiti sooner; and 4) Joseph's failure to submit sufficient corroborating evidence.

### 1. The BIA Erred in Finding Joseph Not Credible Because Joseph Did Not Provide Dario's Last Name

[10] The BIA commented that Joseph had never given Dario's last name. At the removal hearing, this issue was never raised. The BIA thus did not provide Joseph with an opportunity to offer an explanation for his failure to give Dario's last name. *See Campos-Sanchez v. INS*, 164 F.3d 448, 450 (9th Cir. 1999); *Soto-Olarte,* 555 F.3d at 1092 (adverse credibility finding not supported by substantial evidence where agency failed to offer the petitioner an opportunity to explain the inconsistency upon which the adverse credibility determination was partially based). Further, Joseph's failure to disclose Dario's last name does not go to the heart of Joseph's asylum claim. *See Singh v. Ashcroft*, 301 F.3d 1109, 1111-12 (9th Cir. 2002) (finding that an adverse credibility finding is warranted only where inconsistencies go to the "heart of the asylum claim"). Thus, the BIA erred to the extent that it relied on Joseph's failure to provide Dario's last name to find Joseph not credible.

### 2. The IJ Erred in Basing her Adverse Credibility Finding on Joseph's Lack of Understanding of Haiti's Complex Political Situation

The IJ claimed that Joseph "makes the argument that he was a high ranking member of Lavalas, and an easily identified public figure." The IJ found that, "[d]espite this claim, [Joseph] has a very simple and rudimentary understanding of the complexity of the political strife in Haiti." The IJ stated in her decision that she was "not willing to conclude that [Joseph's] understanding of the actual political problems in [Haiti] is limited to his belief that President Aristide would

end poverty and improve the economy in Haiti." The IJ found Joseph's "understanding" to be

> somewhat alarming in light of the fact that he was in Haiti during the period of time when there was great violence being committed by pro-Aristide vigilantes, chimeres. The country condition report, which the Court has reviewed, clearly established that prior to the departure of President Aristide from Haiti in February 2004, that although there were anti-Government demonstrations and rallies, President Aristide had given the civil population authority to act outside the law. The fact that [Joseph] is unaware of this situation is of concern to this Court.

The IJ later found that Joseph testified that Aristide "did not have armed militias, and were not involved in violence," but the IJ determined that Joseph's testimony contradicted "the objective evidence."

[11] Under *Shah v. INS*, "[s]peculation and conjecture cannot form the basis of an adverse credibility finding, which must instead be based on substantial evidence." 220 F.3d 1062, 1071 (9th Cir. 2000). The record reveals that Joseph did not claim to be a director of Lavalas, but just a member and the group leader or "director" of the musical band. It was speculation for the IJ to assume that Joseph, as a member of Lavalas and a song-writer for Aristide, would have a sophisticated understanding of Haiti's political situation. Thus, the IJ's adverse credibility finding cannot stand based on this speculation.

### 3. The IJ and BIA Erred in Basing Their Adverse Credibility Finding on Joseph's Failure to Leave Haiti Sooner

The IJ also erred when she improperly speculated that Joseph never intended to travel to Mexico to study computer

science. The IJ found that his testimony regarding his flight from Haiti was not credible. The IJ concluded that the "record establishes that [Joseph] left Haiti not in response to persecution, but when he had the non-immigrant visa, and made the decision to depart." The BIA affirmed the IJ's opinion on this issue, finding that Joseph "failed to adequately explain why he did not depart his country until June 24, 2004, although the alleged attacks occurred in April 2004, and he was then in possession of a valid visa which did not expire until May 2004."

Joseph first experienced a problem with Dario and Ramikos on April 22, 2004, and departed Haiti two months and two days later. In April 22, 2004, Joseph fled from Artibonite to Lincour. He remained there safely until June 1, 2004, when Dario came looking for him. On June 1, 2004, he fled from Lincour to Port-au-Prince where he presumably secured his second Mexican visa.

**[12]** The IJ and BIA engaged in speculation when they assumed that Joseph's failure to leave Haiti sooner undermined his credibility. *See Paramasamy v. Ashcroft*, 295 F.3d 1047, 1052 (9th Cir. 2002) (holding that the IJ's hypothesis regarding what motivated the applicant's departure from Sri Lanka was speculative). Joseph explained that he had decided not to leave Haiti back in January 2004 because he was preparing for the Haitian independence day celebrations. Thus, when Joseph's problems with Ramikos began on April 22, 2004, he had not planned to leave the country by the expiration of his Mexican visa on May 11, 2004. Joseph left his house in the midst of shooting and in fear of his life on April 22, 2004. It is speculative to conclude that Joseph's failure to leave Haiti any sooner undermines his credibility. The IJ and BIA's conclusion assumes that it would even have been possible to secure transportation and make all the necessary arrangements in less than two months and two days. The BIA also found that Joseph's ability "to apply for and obtain a replacement [Mexican] visa in June 2004 and depart [Haiti]

. . . undermine[d] his claimed fear of harm." The BIA does not explain how or why Joseph's ability to obtain a visa from the Mexican consulate undermines his fear of harm. Logically, every applicant for asylum would be denied if the ability to leave the country without harm undermined the applicant's fear of harm. Thus, the IJ and the BIA erred to the extent that they based their adverse credibility finding on Joseph's failure to leave Haiti sooner.

### 4. The IJ and BIA Erred in Basing Their Adverse Credibility Finding on Joseph's Failure to Provide Corroborative Evidence

[13] The IJ required corroborative evidence because she found that Joseph's credibility was undermined by his inconsistent accounts of his reasons for leaving Haiti according to the notes the IJ took during Joseph's bond hearing and Joseph's testimony during his removal hearing. As discussed above, the IJ erred in relying on her notes from the bond hearing and the other findings the BIA and IJ made in reaching the adverse credibility determination were also erroneous. Substantial evidence does not support the adverse credibility finding. Thus, Joseph is deemed credible and, under the law pertaining to his case,[8] no corroborating evidence is required.[9]

---

[8]Because Joseph filed his claim for asylum before May 11, 2005, we apply the Pre-REAL ID Act standard for corroborating evidence. Under the pre-REAL ID Act case law, corroborating evidence cannot be required from an applicant who testifies credibly. *See Ladha v. INS*, 215 F.3d 889, 901 (9th Cir. 2000) (affirming that an "alien's testimony, if unrefuted and credible, direct and specific, is sufficient to establish the facts testified without the need for any corroboration") *overruled on other grounds by Abebe v. Mukasey*, 554 F.3d 1203, 1208 (9th Cir. 2009) (en banc) (per curiam), petition for cert. filed, 78 U.S.L.W. 3322 (Nov. 16, 2009) (No. 09-600); *Kataria v. INS*, 232 F.3d 1107, 1113 (9th Cir. 2000) (noting that "the BIA may not require independent corroborating evidence from an asylum applicant who testifies credibly. . . .").

[9]The IJ also erred by not giving Joseph an opportunity to explain his failure to provide additional corroborating evidence. *See Sidhu v. INS*, 220

## C.   The BIA Must Accept Joseph's Testimony as True

**[14]** We remand to the BIA to determine Joseph's eligibility for relief from removal. In the facts and circumstances of this case, we hold that the BIA must accept Joseph's testimony as true. *See Soto-Olarte*, 555 F.3d at 1095 ("If it is apparent from the record before us that the IJ and BIA have listed all possible reasons to support an adverse credibility determination, and they are inadequate in law or not supported by substantial evidence, then there may be cases where on remand we can sensibly say that a petitioner should be deemed credible.").

## D.   Motion to Remand

Because we grant Joseph's petition for review, vacate the BIA's adverse credibility finding, and remand pursuant to *INS v. Orlando Ventura*, 537 U.S. 12, 16 (2002) (per curiam), we need not decide whether the BIA erred in denying Joseph's motion to remand based on his submission of new evidence.

## IV.   CONCLUSION

We hold that an IJ may not consider her notes from a petitioner's bond hearing in that petitioner's removal hearing. Bond hearings and removal hearings are separate proceedings

---

F.3d 1085, 1091 (9th Cir. 2000); *Arulampalam*, 353 F.3d at 688. The IJ stated for the first time while rendering her oral decision that she would require, "at a minimum, a death certificate establishing the cause of [Joseph's] cousin's death. . . . [and] documentation establishing the ownership of the vehicle represented in the photograph showing that vehicle on fire." Joseph was not provided with an opportunity to explain why he had not submitted a death certificate or any documentation regarding the ownership of his cousin's car. *See Campos-Sanchez*, 164 F.3d at 450. The BIA similarly erred in not giving Joseph an opportunity to explain his failure to provide corroborating evidence to support his claim that Ramikos members had beaten his mother and raped his sister.

and serve separate purposes. Further, bond hearings lack procedural safeguards to ensure reliability, including the requirement of an oath and a transcript of the proceedings. Thus, testimony given in bond hearings, as stated under 8 C.F.R. § 1003.19(d) shall be "separate and apart from, and shall form no part of, any deportation or removal hearing or proceedings."

Because the IJ erred in considering her bond hearing notes in Joseph's removal hearing, to the extent that her adverse credibility relies on those notes, it is not supported by substantial evidence. Apart from the IJ's error in considering her bond hearing notes, the remaining grounds upon which the IJ and BIA based their adverse credibility finding are not supported by substantial evidence because the IJ failed to give Joseph an opportunity to explain the discrepancy, relied on speculation and conjecture, and imposed an erroneous requirement of corroborative evidence. Therefore we deem Joseph credible.

Joseph argues that he has established past persecution and a well-founded fear of future persecution. Because the IJ's adverse credibility finding was not supported by substantial evidence, this court should grant Joseph's petition and remand to the BIA for further proceedings to determine whether, accepting Joseph's testimony as credible, he is eligible for relief. *See, e.g., Singh v. Gonzales*, 439 F.3d 1100, 1113 (9th Cir. 2006).

The government shall bear the costs for this petition for review.

The petition for review is **GRANTED** and **REMANDED.**

---

GRABER, Circuit Judge, specially concurring:

I agree that the petition in this case must be granted. But I write separately to express my view that, in situations other

than the particular one presented here, statements made at a bond hearing may be admissible and may support an adverse credibility determination.

A bond hearing is informal. It lacks many procedural safeguards and serves a purpose unrelated to eligibility for relief from removal. Here, the notes taken by the immigration judge ("IJ") lack sufficient indicia of reliability to constitute an adequate basis for an adverse credibility determination. *See Singh v. Gonzales*, 403 F.3d 1081, 1087-90 (9th Cir. 2005) (holding that an asylum officer's "Assessment to Refer" usually cannot support an adverse credibility determination); *Singh v. INS*, 292 F.3d 1017, 1021-24 (9th Cir. 2002) (holding that an alien's airport interview usually cannot support an adverse credibility determination).

I reach this conclusion largely because of the nature of the alleged conflicts between the IJ's notes and Petitioner's testimony. The IJ relied on a perceived lack of detail, but that reliance is insufficient. *Singh*, 292 F.3d at 1022. The only *conflict* between the IJ's notes and Petitioner's testimony is whether Dario was pro-Aristide or anti-Aristide. As an initial matter, it is puzzling what relevance that fact would have to a bond hearing. Perhaps because the fact was *not* relevant, I think that the IJ's "pro" notation was a mere *transcription error* of the sort that is likely to occur when a person takes informal notes at an informal proceeding. Because there is no recording or transcript of the bond hearing, there is no way to test the correctness of the IJ's notes on this tiny and previously irrelevant detail. For those reasons, the adverse credibility determination cannot be supported by the IJ's reference to her own notes at the earlier bond hearing.[1]

In other situations, however, statements made at a bond

---

[1] I agree with the majority opinion that the IJ's other reasons for the adverse credibility determination are not supported by substantial evidence.

hearing might be admissible and might support an adverse credibility determination. For instance, if a transcript of the proceeding were available, neither the regulations nor common sense would prohibit the use of statements made by the petitioner or by other witnesses. In that situation, the regulations permit consideration of any witness' prior statements. 8 C.F.R. § 1240.7(a).

In my view, 8 C.F.R. § 1003.19(d) is not to the contrary. That regulation states, in relevant part, that "[c]onsideration by the Immigration Judge of an application or request of a respondent regarding custody or bond under this section shall be separate and apart from, and shall form no part of, any deportation or removal hearing or proceeding." That is, at a later removal hearing, the IJ may not consider the fact that an alien has applied for or requested bond, but the regulation does not prohibit the IJ from considering relevant statements made at a bond hearing.