**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| IMAN KHALIL SURADI, AKA Iman Suradj,<br><br>          Petitioner,<br><br>  v.<br><br>ERIC H. HOLDER, Jr., Attorney General,<br><br>         Respondent. | No. 10-70660<br><br>Agency No. A089-859-189<br><br>MEMORANDUM[*] |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted April 15, 2011
Pasadena, California

Before: KOZINSKI, Chief Judge, D.W. NELSON and BYBEE, Circuit Judges.

Iman Khalil Suradi ("Suradi"), a native and citizen of Jordan, petitions for

review of the Board of Immigration Appeals' (BIA) rejection of her application for

deferral of removal under the Convention Against Torture (CAT). We grant the

---

      [*]    This disposition is not appropriate for publication and is not precedent
except as provided by 9th Cir. R. 36-3.

petition and remand to the BIA for further proceedings consistent with this disposition.

To establish eligibility for deferral of removal under CAT, Suradi must demonstrate "only a chance greater than fifty percent that [she] will be tortured if removed" to Jordan. *Hamoui v. Ashcroft*, 389 F.3d 821, 827 (9th Cir. 2004) (citations omitted); *see* 8 C.F.R. §§ 1208.16(c)(2), 1208.17(a). The torture may be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). "Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." *Id.* § 1208.18(a)(7); *see also Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1060 (9th Cir. 2006) ("It is enough that public officials could have inferred the alleged torture was taking place, remained willfully blind to it, or simply stood by because of their inability or unwillingness to oppose it.").

When, as here, the BIA does not express disagreement with any portion of the IJ's decision, cites *Matter of Burbano*, 20 I. & N. Dec. 872, 874 (BIA 1994), and adds its own review of the evidence and the law, this court reviews both the BIA's and the IJ's decisions. *See Joseph v. Holder*, 600 F.3d 1235, 1239-40 (9th

2

Cir. 2010).  We review the agency's findings of fact in connection with a denial of CAT relief for substantial evidence.  *Morales v. Gonzales*, 478 F.3d 972, 983 (9th Cir. 2007).  "The substantial evidence standard requires us to uphold the BIA's determination if supported by reasonable, substantial, and probative evidence on the record."  *Id.* (internal quotation marks and citation omitted).  To overturn the agency's decision, Suradi must show that "the evidence not only *supports* . . . but *compels*" reversal.  *Pedro-Mateo v. I.N.S.*, 224 F.3d 1147, 1150 (9th Cir. 2000) (citation omitted).

In evaluating the propriety of relief under CAT, a petitioner's testimony alone, if credible, "may be sufficient to sustain the burden of proof without corroboration."  8 C.F.R. § 1208.16(c)(2).  Because the IJ did not make an adverse credibility finding in Suradi's removal hearings, the BIA was required to accept Suradi's testimony, and all reasonable inferences to be drawn from it, as true.  *Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1056 (9th Cir. 2006).  In addition, "[t]he regulations . . . explicitly require the IJ to consider 'all evidence relevant to the possibility of future torture.'"  *Aguilar-Ramos v. Holder*, 594 F.3d 701, 705 n.6 (9th Cir. 2010) (quoting 8 C.F.R. § 208.16(c)(3)) (rejecting the government's contention that the Board is not required to cite and refute every piece of evidence on appeal).

3

## A. *Likelihood of Torture*

The record compels the conclusion that Suradi will more likely than not be killed in an honor killing if she is removed to Jordan. Suradi testified that it is "something definite" that she will be killed due to the shame of her extramarital affairs and drug conviction. Under § 1208.16(c)(2), this testimony alone, even if not corroborated, may be sufficient to sustain her burden. However, her brother corroborated her testimony, stating, "It's not I think. I know that she will [be killed]." In addition, Suradi provided several articles and country reports describing the problem of honor killings in Jordan, a fact which the IJ acknowledged.

Substantial evidence does not support the IJ's finding that Suradi has not reported any threats from her family or husband. This finding is directly contrary to Suradi's credible testimony; her declaration in support of her asylum application asserts that her husband has explicitly threatened to kill her to "cleanse the dishonor" caused by her extramarital affairs in the U.S. Suradi also declares that her family has "threatened that I must end [an extramarital] relationship otherwise I would pay the price."

Because the IJ and BIA were required to accept Suradi's testimony as true, *Ornelas-Chavez*, 458 F.3d at 1056, and the testimony of both Suradi and her

4

brother indicate it is nearly certain that Suradi will be killed, the record compels the conclusion that it is more likely than not that Suradi will be subjected to an honor killing by her family or estranged husband. There is no evidence in the record rebutting her credible testimony.

*B.    Government Acquiescence*

The IJ's finding that the Jordanian government does not acquiesce in honor killings is not supported by substantial evidence. Purporting to rely on the State Department's human rights report on Jordan, the IJ found that there were only sixteen honor killings in Jordan in 2008, and that these killings were prosecuted by the government. Therefore, the IJ concluded that Suradi had failed to meet her burden to show that the government would more likely than not be unable or unwilling to prevent the harm. However, the IJ's finding was based on a clear misreading of the State Department report. The report simply noted that there were only sixteen *prosecutions* of honor killings in 2008, and that many more instances of honor killings may have gone unprosecuted or unreported. The Human Rights Watch report in the record agreed, stating, "Undoubtedly there are more 'honor' killings than the average of fifteen per year that the government has recorded since 1999. . . . *The Jordan Times* . . . has consistently reported higher numbers than the government . . . ."

5

Moreover, even if the IJ's statement accurately reflected the record evidence, he failed to explain how the relative rarity of honor killings is relevant to the question presented here. Namely, assuming that only sixteen women are murdered each year, this would be cold comfort if Suradi were among that unfortunate cohort and the government was unable or unwilling to prevent those murders, as she alleges. Indeed, even if the government had prosecuted all honor killings, whatever their number, this finding is not probative to the question of whether the Jordanian government acts to *prevent* honor killings. Indeed, according to the State Department, the only action the government takes before these murders take place is to "regularly place[] potential victims of honor crimes in involuntary protective custody in . . . a detention facility where some have remained for more than 20 years." Thus, the record suggests that the government's purported "protection" amounts to forced imprisonment. Worse, according to Human Rights Watch, an imprisoned woman may only be released to a male family member. Because a family member is usually the perpetrator of an honor killing, a male relative may pick a woman up from prison only to kill her.

The IJ also fails to address Suradi's credible testimony regarding government acquiescence. Suradi presented evidence that Jordanian officials are willfully blind to—if not supportive of—honor killings. In addition to her own

declaration that the "Jordanian government cannot and will not protect me from death," and her testimony that in the past the mayor and the police would not intervene when her husband abused her, Suradi's brother Ismail stated that the police will not be able to protect Suradi from her family if she is returned to Jordan. He explained, "There's no such a thing as police protection in Jordan. I mean it just doesn't exist."

Other evidence in the record supports their statements. A Human Rights Watch report states that "[p]olice rarely investigate 'honor' killings, seldom take any initiative to deter these crimes, and typically treat the killers as vindicated men." Provisions of the Jordanian criminal code (Articles 98 and 340) provide for drastically reduced sentences for perpetrators of honor killings, and the State Department report itself states that the typical sentence was less than six months, Jordan's government has blocked efforts at reform. A news report indicates that Jordan's parliament has refused to repeal these leniency provisions on grounds that tougher penalties for honor killings would lead to more adultery.

Since the IJ's and BIA's decision rested on a misreading of the State Department's report, however, they did not address and weigh the evidence in the record detailed above, including Suradi's credible testimony. Instead of making factual determinations in the first instance, therefore, we remand to the BIA to

7

consider fully the reports cited above and the record as a whole.  *See She v. Holder*,
629 F.3d 958, 963-64 (9th Cir. 2010) (remand to the BIA for further factfinding is
appropriate where the BIA's fails to provide a proper explanation for its findings).

Petition **GRANTED** and **REMANDED**.

Suradi v. Holder, No. 10-70660.

Chief Judge **KOZINSKI**, dissenting:

**1.** The majority first errs in finding the testimony of Suradi and her brother compels the conclusion that she will be subjected to an honor killing if returned to Jordan. See maj. at 4. Their testimony, if believed, proves only that they have a genuine subjective belief that Suradi will be killed; it does not prove that their prediction is objectively reasonable or factually accurate. Cf. Zhao v. Mukasey, 540 F.3d 1027, 1029 (9th Cir. 2008). Although this evidence might have supported a finding that Suradi will be tortured, "[t]o reverse the BIA . . . we must find that the evidence not only supports that conclusion, but compels it." INS v. Elias-Zacarias, 502 U.S. 478, 481 n.1 (1992). It does not.

The majority compounds its error by mischaracterizing the IJ's finding that Suradi has not reported any threats. See maj. at 4. The IJ noted that, "in the three years since her conviction, [Suradi] has not reported that she received any threats from fellow narcotics traffickers, or from her family members, or from her exhusband indicating that they had intentions to harm her if she returned." **[AR 51]** This finding was clearly a rejection of her claim that she would be tortured based on her narcotics conviction, not of her claim that she would be subjected to an honor killing based on her extramarital affairs, which is addressed separately in

the following paragraph.  Compare IJ Decision at 4 (rejecting claim "with respect to the fellow narcotics traffickers"), with id. at 5 (rejecting claim "[w]ith respect to the honor killings").   Thus, this finding is in no way "contrary to Suradi's credible testimony . . . that her husband has explicitly threatened to kill her to 'cleanse the dishonor' caused by her extramarital affairs."  Maj. at 4 (emphasis added).

**2.**  The majority next errs in rejecting the IJ's determination that the Jordanian government does not acquiesce in honor killings.  Suradi was required to show that the torture would be "inflicted by or at the instigation of or with the consent or acquiescence of a public official."  Afriyie v. Holder, 613 F.3d 924, 937 (9th Cir. 2010) (quoting 8 C.F.R. § 208.18(a)(1)) (internal quotation mark omitted).  The record here shows that, far from being complicit in the torture, the Jordanian government took an active stance against honor killings by outlawing the practice, putting potential victims in protective custody and prosecuting known offenders.  The majority's criticism of the IJ's conclusion is wholly unfounded.

The majority's assertion that "the IJ's finding was based on a misreading of the State Department report" is plain wrong.  Maj. at 5.  The report advises that "authorities prosecuted 16 reported instances of honor crimes that resulted in death of the victim, although activists reported that numerous additional unreported cases

likely occurred." **[AR 261]** The State Department report clearly does not adopt these estimates of "likely" additional honor killings as fact. The report adopts 16 as the figure of known honor killings and the IJ was entitled to rely on that figure. The majority's contrary suggestion borders on the frivolous. See Zehatye v. Gonzales, 453 F.3d 1182, 1189 (9th Cir. 2006).

Even assuming there were more killings than prosecutions, this hardly compels a finding of government acquiescence. In any system of justice, there are necessarily some crimes that go unsolved, and some perpetrators who escape punishment. In the United States, for example, nearly 30% of non-negligent homicides went unresolved in 2009, yet no one seriously contends that the U.S. Government acquiesces in murder. See Federal Bureau of Investigation, Crime in the United States: Offenses Cleared, http://www2.fbi.gov/ucr/cius2009/offenses/clearances/index.html (last visited May 29, 2011). And when we speak of the number of homicides committed, we rely on the number of crimes reported to the police, even though we know that many crimes go unreported and undetected. As the majority must be aware, honor killings are very difficult to prosecute because there are frequently no witnesses willing to talk to the police, and family members conspire to conceal the crime. What the State Department report does not say is that there are any prosecutable

crimes that the Jordanian government left un-prosecuted.

Nor do "drastically reduced sentences for perpetrators of honor killings" reflect government approval. Maj. at 7. In our own country, many people consider a husband who explodes into a murderous frenzy upon catching his wife in bed with another man as less culpable than a cold, calculating killer. See Rowland v. State, 35 So. 826, 827 (Miss. 1904). In such situations, these accused murderers are entitled to claim provocation and try to earn the sympathy of the jury. Id. If successful, the verdict returned may be voluntary manslaughter rather than murder, and sentences are accordingly "drastically reduced." The common law embodiment of our collective sentiment that some murders are more forgivable than others doesn't mean that the government acquiesces in killing homewreckers.

And, of course, whether the Jordanian government does anything to "prevent" honor killings has absolutely no bearing on whether it affirmatively acquiesces in them. Maj. at 6. The majority's contrary assertion inverts the traditional burden of proof by requiring the U.S. Attorney General to prove that the Jordanian government will succeed in protecting Suradi, rather than requiring Suradi to prove government acquiescence. Contra Reyes-Reyes v. Ashcroft, 384 F.3d 782, 787 (9th Cir. 2004).

The majority's decision boils down to a concern that the Jordanian

government isn't doing enough to protect women in Suradi's situation.  But it's not our job to sit in judgment of the domestic policy of a foreign nation.  Instead, we must faithfully apply the standard articulated in the Convention Against Torture and ask whether the government has acquiesced in these crimes.  <u>See</u>  8 C.F.R. § 208.18(a)(1).  Here, the IJ could reasonably find that it has not.

*          *          *

The majority scours the IJ and BIA's decisions with a fine-tooth comb to find any misstep on which to base its relief, but this is not our role as an appellate court reviewing an agency's decision.  <u>See</u> <u>Aruta</u> v. <u>INS</u>, 80 F.3d 1389, 1393 (9th Cir. 1996).  Because I do not believe the record compels the conclusion that it is more likely than not that Suradi will be tortured, or that, if she is tortured, it will be at the behest of the government, I dissent.