**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| YANKO YOSIFOV LUKOV, | No. 12-71810 |
| Petitioner, | Agency No. A078-045-981 |
| v. | |
| LORETTA E. LYNCH, Attorney General, | MEMORANDUM* |
| Respondent. | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted February 10, 2016
San Francisco, California

Before: TASHIMA and W. FLETCHER, Circuit Judges and GETTLEMAN,**
Senior District Judge.

Yanko Lukov, a citizen of Bulgaria, petitions for review of the decision of

the Board of Immigration Appeals ("BIA") denying his claims for asylum,

---

\*      This disposition is not appropriate for publication and is not precedent
except as provided by 9th Cir. R. 36-3.

\*\*      The Honorable Robert W. Gettleman, Senior District Judge for the
U.S. District Court for the Northern District of Illinois, sitting by designation.

withholding of removal, and protection under the Convention Against Torture ("CAT"). We deny the petition.

Substantial evidence supports the BIA's adverse credibility determination. Because Lukov's application was filed before May 11, 2005, the REAL ID Act does not apply. *Joseph v. Holder*, 600 F.3d 1235, 1240 n.3 (9th Cir. 2010). We agree with Lukov and the dissent that some of the purported inconsistencies relied upon by the BIA, such as the inconsistency regarding where he was when he woke up from his coma, do not go to the heart of his claim. *See Smolniakova v. Gonzales*, 422 F.3d 1037, 1045 (9th Cir. 2005). Nonetheless, substantial evidence supports the BIA's decision in light of Lukov's inconsistent testimony regarding his absences from a military base. Originally, Lukov testified that he had been given leave on only one occasion. After the Immigration Judge ("IJ") confronted Lukov with a medical record indicating that Lukov had twice visited a hospital approximately 150 kilometers away during the time he was supposedly at the base, Lukov for the first time testified that he had run away from the base two times after experiencing beatings. But the medical record did not support this new assertion either, as the document indicated that Lukov was treated for bronchitis during one of these visits, not for injuries that would normally be associated with a beating. Later testimony further conflicted with Lukov's original

statement; during cross-examination, Lukov testified that he ran away five to ten times during his military service.

These inconsistencies goes to the heart of Lukov's claim. Lukov claimed asylum on account of his Roma ethnicity. His claim stemmed in part from the mistreatment and beatings he received during his conscripted military service in a Roma-only brigade. Inconsistent testimony regarding Lukov's experiences while at the military base, especially as they relate to the beatings he received, thus goes to the heart of his allegations.

**Petition for review DENIED.**

*Lukov v. Lynch*, 12-71810

GETTLEMAN, Senior District Judge, dissenting.

I respectfully dissent, and conclude that the adverse credibility finding of the Board of Immigration Appeals ("BIA") is not supported by substantial evidence. Therefore, I would grant the petition, reverse the adverse credibility finding of the BIA, and remand for further proceedings.

The BIA identified four bases upon which the Immigration Judge ("IJ") found that petitioner's claims were not credible: (1) the inconsistency between petitioner's written statement and testimony concerning whether he first awoke at home or in the hospital following his alleged beating by police on New Year's Eve 1999; (2) the inconsistency between petitioner's testimony that he was given leave from the army on only one occasion and a medical document indicating that he had visited a hospital in his hometown, 150 kilometers from where he was stationed, on two occasions during his military service; (3) the implausibility of petitioner's testimony, given for the first time during the 2009 hearing, that he had left the military base without leave on several occasions; and (4) petitioner's inability to explain why his birth certificate, issued in April 2000, contained his Bulgarian name and his parents' Roma names when he had testified that all Roma, including his parents, were forced to change their names to Bulgarian names in 1980.

With the exception of the inconsistency concerning petitioner's birth certificate, the BIA conducted its own review and analysis of each inconsistency. The BIA found that petitioner was given the opportunity to explain each inconsistency, but that his explanations were unpersuasive or led to additional inconsistencies. Consequently, the BIA held that the IJ's adverse credibility determination was not clearly erroneous.

Because petitioner's application was filed before May 11, 2005, the REAL ID Act does not apply. *Joseph v. Holder*, 600 F.3d 1235, 1240 n.3 (9th Cir. 2010). Accordingly, the inconsistencies relied on by the BIA in finding petitioner not credible must go to the heart of his claim. *Desta v. Ashcroft*, 365 F.3d 741, 745 (9th Cir. 2004). I conclude that because none of the identified discrepancies go to the heart of petitioner's claims, the BIA's adverse credibility finding is not supported by substantial evidence. *See Yi Quan Chen v. INS*, 266 F.3d 1094, 1098 (9th Cir. 2001) (reversed on other grounds).

The State Department's Country Report on Bulgaria established that mandatory military service is a common practice for all Bulgarian citizens. Consequently, petitioner's claims do not stem in part from the fact that he was forced to serve in the military, because such service was required regardless of ethnicity. Instead, petitioner's claims stem from the repeated physical abuse that

2

he suffered while living in Bulgaria, only some of which he alleges he received while serving in the military. Petitioner has consistently testified that because of his Roma ethnicity[1] he was assigned to a labor battalion and often beaten during his military service. Far from diminishing these allegations of abuse, petitioner's medical records from the Rakovski hospital corroborate his claim that he was in fact beaten on at least one occasion while in the military. Any inconsistency concerning the amount of leave time petitioner was allowed to take during his military service has no bearing on petitioner's claims of physical abuse, and therefore does not go to the heart of petitioner's claims. *See Kaur v. Ashcroft*, 379 F.3d 876, 884 (9th Cir. 2004) (superseded by statute on other grounds) ("Minor inconsistencies that reveal nothing about an asylum applicant's fear for [her] safety are not an adequate basis for an adverse credibility finding." (internal quotations omitted)) .

Moreover, petitioner's account of his 1999 New Year's Eve police beating (the event that caused petitioner to flee Bulgaria), a narrative that is corroborated by medical records,[2] is sufficient, standing-alone, to support his claims for relief.

---

[1] The State Department's Country Report also confirmed that minorities are regularly assigned to labor battalions during their mandatory military service.

[2] Petitioner's hospital records from January 1, 2000, indicate that he "suffered a beating by known individuals; Cannot recollect the incident; Complains of severe headache, nausea, vomiting, vertigo; Obj. Swelling on the head, heamatomas [sic] on the entire body; Not

(continued...)

3

Petitioner's written statement alleged that while at a Free Bulgaria party on New Year's Eve in 1999, police raided the party and assaulted the attendees. According to petitioner's statement, the police began hitting everyone with their batons, and the next thing he remembered was "waking up at the hospital," at which time he was told that he had been in a coma for 11 hours. Following this incident, petitioner immediately fled Bulgaria. Although petitioner testified on a single occasion that he first woke up at home following the alleged beating, as the majority has held, where petitioner woke up from his coma does not go to the heart of his claims. Because this event is sufficient on its own to support petitioner's claims, it is not necessary to consider his experiences while in the military more than a decade before the persecution that precipitated his fleeing Bulgaria.

Finally, although it is not clear whether the BIA relied on the perceived inconsistency concerning petitioner's birth certificate, this reason, like the others, is not a sufficient basis upon which to find petitioner not credible. The IJ[3] held that the inconsistency goes to the heart of petitioner's case because it concerns his

---

[2](...continued)
cognizant of time and place; . . . Direction to neurosurgeon."

[3] As noted above, the BIA identified this inconsistency as one of the bases upon which the IJ found petitioner not credible, but did not engage in its own analysis concerning the inconsistency. I will assume that the BIA adopted and affirmed the IJ's reasoning with respect to this inconsistency. *See Alaelua v. INS*, 45 F.3d 1379, 1382 (9th Cir. 1995) (holding that where the BIA adopts and affirms the findings and reasoning of the IJ, the court reviews the IJ's opinion as if it were the opinion of the BIA).

claimed Roma ethnicity. However, by identifying his parents by their Roma names, the birth certificate also identifies petitioner as Roma, regardless of whether his Roma or Bulgarian name was used. Petitioner, in fact, explained this concept during direct examination when he testified that someone looking at the document would know his ethnic origins because his parents' Roma names were used on the form. As such, contrary to the IJ's reasoning, the birth certificate supports petitioner's claim that he is Roma.

Moreover, whether petitioner was in fact ordered to change his Roma name to a Bulgarian name does not go to the heart of his claims. In light of the fact that the alleged name change occurred in 1980 and petitioner did not flee Bulgaria until 2000, the information was not a basis for his claimed persecution. Instead, it was merely background information concerning discrimination against Roma in Bulgaria.

Because the grounds upon which the BIA based its conclusion fail to persuade me of the reasonableness of the adverse credibility finding, I find petitioner's testimony credible and conclude that the record compels reversal. *See INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992) (For the court "[t]o reverse the BIA finding we must find that the evidence not only *supports* [reversal], but

5

*compels* it." (emphasis in original)).  For these reasons, I would grant the petition,

reverse the BIA's finding, and remand for further proceedings.